# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,
v.
MICHAEL ALLAN LAMB,
Defendant and Appellant.

S166168

Orange County Superior Court
03CF0441

---

July 11, 2024

Justice Evans authored the opinion of the Court, in which
Chief Justice Guerrero and Justices Corrigan, Liu, Kruger,
Groban, and Jenkins concurred.

---

PEOPLE v. LAMB

S166168


Opinion of the Court by Evans, J.


A jury convicted defendant Michael Allan Lamb of the first degree murder of Scott Miller (Pen. Code, § 187, subd. (a))[1] and the willful, deliberate, and premeditated attempted murder of Sergeant Michael Helmick, a peace officer (§§ 664, 187, subd. (a)). The jury also found Lamb guilty of conspiracy to commit murder (§§ 182, subd. (a)(1), 187, subd. (a)), unlawfully carrying a loaded firearm in public by an active participant in a criminal street gang (former § 12031, subd. (a)(1), (2)(C)), and two counts each of possession of a firearm by a felon (former § 12021, subd. (a)(1)) and street terrorism (§ 186.22, subd. (a)).

The jury found true a gang-murder special-circumstance allegation. (§ 190.2, subd. (a)(22).) As to all counts except the street terrorism charges, it also found true the allegation that the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang with the intent to promote, further, or assist in the criminal conduct of the gang members. (§ 186.22, subd. (b)(1)(A).) As to the murder and conspiracy to commit murder counts, the jury found true allegations that Lamb intentionally and personally discharged

---

[1]    All undesignated statutory references are to the Penal Code.

1

a firearm in the commission of the offenses causing death. (§ 12022.53, subd. (d).)[2]

The jury failed to reach a penalty verdict. At the penalty phase retrial, a different jury fixed the penalty at death. The court entered a judgment of death.

This appeal is automatic. (§ 1239, subd. (b).) Based on recent amendments to section 186.22 from the enactment of Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill No. 333), we reverse Lamb's convictions for street terrorism and unlawfully carrying a loaded firearm in public by an active participant in a criminal street gang. For the same reason, we reverse the true findings on the gang enhancements and gang-murder special circumstance. We vacate Lamb's death judgment and remand the case to the trial court for any retrial of the reversed convictions, enhancements, and special circumstance. In all other respects, we affirm.

## I. FACTUAL BACKGROUND

### A. Guilt Phase

#### 1. *Prosecution Evidence*

On the evening of March 8, 2002, Scott "Scottish" Miller, a founding member of white supremacist gang Public Enemy Number One (PEN1), also known as PEN1 Death Squad, was

---

[2] Lamb was tried with Jacob Rump against whom the prosecutor did not seek the death penalty. Rump also was convicted of Miller's murder and conspiracy to commit murder, and the jury found true the gang-murder special-circumstance allegation. He was sentenced to life imprisonment without the possibility of parole. Coperpetrator Billy Joe Johnson was tried separately and convicted of Miller's murder and the jury returned a verdict of death. His judgment was affirmed on appeal. (*People v. Johnson* (2016) 62 Cal.4th 600, 607.)

found dead in an alley with a single gunshot wound to the back of his head. Three days later on March 11, fellow PEN1 members Lamb and Jacob Rump were arrested after a pursuit during which Lamb fired a shot at Sergeant Helmick using the same gun that had killed Miller. The prosecutor's theory was that, acting upon an order to kill Miller in retaliation for having participated in a news program about the gang, fellow PEN1 member Billy Joe Johnson drove Miller to the alley where Lamb, backed up by Rump, shot Miller.

a. *Murder of Scott Miller*

Christina Harris testified that she lived in a two-story apartment on West Gramercy Avenue in Anaheim. Lamb and Rump, as well as PEN1 associate Tanya Hinson, would occasionally stay at Harris's apartment. On March 8, Lamb called the apartment to speak to Hinson and said he had something very important to talk about. Harris conveyed this message to Hinson. Later that night, Harris saw Lamb, Rump, and Hinson in her living room. She asked them to leave, and they complied.

Two to three minutes later, between 10:30 p.m. and 11:00 p.m., Harris heard a single gunshot. Between three and 10 minutes after the gunshot, Harris looked out her bedroom window and saw a blue car driving through the alley with what appeared to be three "Mexican" men with shaved heads. About 10 minutes later, Harris and a friend went outside and saw a body lying on the ground, who was later identified as Miller.

Residents in the area of West Gramercy Avenue testified that at approximately 11:30 p.m. that evening, they heard a loud bang or gunshot coming from a nearby alleyway. Approximately 20 seconds later, a neighbor heard screeching tires coming from

the alley. Anaheim police arrived on the scene just before midnight and discovered Miller with a gunshot wound to the back of the head lying facedown in the alley next to a dumpster. A shell casing was found nearby. A black baseball hat and a Pepsi can were underneath Miller's body. The pathologist testified that Miller died from a single gunshot wound to the back of the head and that he had no defensive wounds. He would have been immediately rendered unconscious and most likely died several minutes after being shot.

### b. *Attempted murder of Sergeant Michael Helmick*

Anaheim Police Sergeant Michael Helmick testified that on the afternoon of March 11, he was working undercover and therefore was not in uniform. While driving an unmarked white Buick Century, he was dispatched to investigate a possible stolen vehicle, a 2002 Ford Taurus, parked in an alley near a home where Lamb and Rump had recently been staying. Sergeant Helmick arrived at the alley and an Anaheim Police Department helicopter provided assistance, flying a wide orbit about 1,800 feet above the ground to avoid detection. Looking over an adjacent wall, Sergeant Helmick confirmed that the Taurus had been reported stolen, and then took up a position at the south end of the alley and contacted Anaheim Police Detective Danny Allen for assistance.

Sergeant Helmick was advised that the Taurus, which was driven by Rump, had begun to move, and Sergeant Helmick followed the Taurus in his vehicle when it exited the alley. Marked police cars were also asked to respond and the helicopter began to descend. After driving a short distance, the Taurus stopped in the middle of the roadway and Sergeant Helmick brought his vehicle to a stop about five car lengths

behind; there were no other vehicles between Sergeant Helmick and Rump, and Sergeant Helmick could see Rump continuously staring at him through the left side-view mirror. A man later identified as Lamb with a shaved head and carrying a black jacket ran toward and entered the Taurus. Rump continued looking at Sergeant Helmick through the mirror and the Taurus then made an abrupt U-turn and a pursuit commenced.

After a short pursuit joined by Detective Allen driving an unmarked Monte Carlo, Lamb and Rump exited the Taurus and ran into an apartment complex. The helicopter had descended to between 400 and 600 feet above the ground, and Sergeant Helmick and Detective Allen pursued Lamb and Rump on foot. At that altitude, the helicopter was extremely loud to a person on the ground. Though they were both in plain clothes, Sergeant Helmick had a badge on his belt and Detective Allen was wearing a raid jacket marked with "Police" on the front and back. Both officers were holding their radios and had their guns drawn. Lamb and Rump went to a second story balcony of the apartment complex. As the officers approached, they heard a gunshot directly above them. The helicopter pilot observed Lamb lift himself over the railing and point a stainless steel handgun at Sergeant Helmick; the pilot saw a muzzle flash from the gun. A witness thought he heard someone yell "police" before hearing a gunshot. Though when asked on cross-examination whether he was sure he heard the announcement before the gunshot, the witness responded, "Well, um, I don't know." Lamb and Rump ultimately were taken into custody.

c. *Investigation*

Forensic specialists testified that after Lamb's arrest, gunshot residue was found on his right dominant hand. This

indicated that he had either fired a gun, was in close proximity to a fired gun, handled a discharged gun, or had touched a surface that was near a gun when it was fired. A glove found in the Taurus also had gunshot residue.

A forensic supervisor testified that the single-action semiautomatic handgun recovered from the March 11 crime scene was jammed. The safety was off, the hammer was cocked in the firing position, and the magazine was loaded with 10 rounds of live ammunition; however, a spent cartridge had not ejected from the chamber. A forensic firearm examiner testified that a bandana tied around the grip may have impeded the movement of the slide, and that this gun had also fired the expended casing found near Miller's body.

PEN1 member Darrell Mason testified that he was in custody in the Orange County jail with Lamb in June 2002. Lamb claimed to have killed Miller and said "he had stripes coming for that," which Mason understood to mean that Lamb expected "some status coming to him." Lamb told Mason he had shot Miller in the back of the head. Lamb seemed to be "looking for a little bit like a pat on the back or something." Before Miller was killed, Lamb did not have a high status within PEN1. Mason knew Miller had spoken about PEN1 to Fox 11 News and that as a result, there was an understanding within the gang that something was "supposed to happen" to Miller. Miller was "in the hat"[3] for bringing new members into the gang at a time

---

[3] Mason explained that if a person is "in the hat" or has a "green light" on them, that means "that you are no longer considered to be in good graces with active members or people that are in general population. You have a hit on you."

when a PEN1 founder, Donald Mazza, wanted PEN1 to go under the radar.

### d. *Expert testimony regarding white supremacist gangs*

Lieutenant Clay Epperson of the Costa Mesa Police Department testified concerning his investigations of PEN1 and provided expert testimony on white supremacist gangs. Lieutenant Epperson opined Lamb and Rump were active PEN1 members in March 2002. In early 2002, Lieutenant Epperson heard a recurring rumor that Miller would be killed for his participation in broadcast interviews with a local Fox television station. It was initially rumored that PEN1 members John Gross or Jesse Wyman had been designated to carry out the hit. Before his death, Miller was disliked within PEN1 and perceived as out of control, although he still had standing in the gang.

Lieutenant Epperson testified that a white supremacist gang member earned respect through the use of violence for the benefit of the gang. Bragging about committing a violent crime was expected. One member was expected to back up another in committing violent crimes.

In white supremacist gang culture there was "payback," including violent sanctions, for any perceived wrong. A lengthy period could elapse between an act of disrespect and the payback; Lieutenant Epperson had investigated cases where payback happened years after a "disrespectful" act. Disclosing information about the gang to outsiders or to law enforcement was seen as treasonous.

Miller had been a founding member of PEN1, along with Mazza, Brody Davis, Devlin Stringfellow, and Dominic Rizzo.

The PEN1 internal discipline process was arbitrary and ad hoc. PEN1 leaders used egregious violence to intimidate and dissuade other gang members, associates, and the general public from speaking with police or testifying in court.

### e. *Fox 11 News videos*

In 1999, Miller participated in a taped interview with Fox 11 News about PEN1. On February 20 and 21, 2001, Fox aired two videos (the Fox videos or videos) styled as an exposé of the gang and featuring Miller's interview. Although Miller's appearance and voice were disguised, it was stipulated that the person in question featured in the video was Miller. Moreover, Johnson testified that he immediately knew it was Miller based upon his tattoos, Miller's pit bull featured in the videos, and "things that were around him, range of movement, everything." Johnson further testified that when the videos aired, he was not the only person to immediately recognize Miller: "Not only me, everybody did. Everybody called everybody. Everybody was like, 'what the hell's up with that?' "

The videos discussed the origins of PEN1 and its place in the skinhead movement, its efforts to recruit new members, an alliance Mazza, Rizzo, and Stringfellow made with the Aryan Brotherhood and Nazi Lowriders, and detailed some of the violent acts committed by its members. It also displayed images of white supremacist symbols and tattoos, guns, and drugs. Miller's interview was interspersed throughout the videos, with Miller describing PEN1's activities, including its history of violence, weapon use, and drug use and sales.

### 2. *Defense Evidence*

Lamb's defense was that Johnson, assisted by Wyman and Shirley Williams, had killed Miller.

Testifying on behalf of Lamb, Johnson claimed sole responsibility for the murder. Sometime on March 8, Miller, Johnson, and Andrea Metzger attended a party. Johnson had known Miller for about 20 years, but their relationship had been strained for some time because of the Fox videos and other personal issues. The party was the first time Johnson had seen Miller since the videos aired. Metzger saw Johnson and Miller talking at the party and heard Miller joking that he had to keep his guard up.

Williams, who knew Miller, arrived at the party at approximately 10:00 p.m. but left shortly thereafter. When she returned around 11:00 p.m., Miller was no longer at the party, but Johnson was. Johnson testified that at some point in the evening, between 8:00 and 10:00 p.m., he and Miller left the party in Johnson's truck to buy drugs. At one point Miller asked Johnson to pull into a strip mall, where Miller made a phone call. Miller's friend Marnie Simmons received a voicemail from Miller at 10:23 p.m. that night telling her he was at the party but was going to some address and was scared. A voice that sounded like Johnson's was heard in the background telling Miller to get off the phone and to "tell her, see ya."

Johnson testified that after Miller got back in the truck, they drove to an alley and parked. As they were walking, Johnson testified that he was "pretty perturbed with the guy, really had it with him," so he reached in his waistband, grabbed his gun, "and blasted him." Johnson then went back to the party.

Johnson further testified that the night after killing Miller he happened to see Lamb. Johnson had not seen Lamb since meeting him about a year earlier. Lamb told Johnson that he

had been shot at the previous night and that he needed a weapon, so Johnson gave Lamb the murder weapon explaining it was "hot."

Johnson told mutual friend Gordon Bridges that they had found Miller shot in the back of the head in an alley in Anaheim. Bridges testified that on some later date, Williams told him that Johnson forced her to drive Johnson and Miller to Anaheim with Wyman in the back of the truck. A couple of weeks after the murder, Johnson told Bridges to watch his mouth and to "back off" Wyman. Bridges asked Johnson to "look me in the eye and tell me you didn't kill Scottish," a nickname for Miller, and Johnson told Bridges to mind his business and that it was "politics." Bridges told investigators that Johnson said Miller was shot in the back of the head three times.

In 2004, while Rump was awaiting trial for Miller's murder, Johnson and Rump were cellmates at the Orange County jail and got along very well. Around that time, Johnson contacted Rump's defense investigator and informed him that Lamb and Rump were not guilty and that the gun had "came from" Johnson. On June 30, 2006, Johnson pled guilty to an unrelated second degree murder charge and other crimes and was sentenced to 45 years to life. On July 5, 2006, Johnson reached out to Lamb's defense investigator and confessed to killing Miller in 2002.

Dr. David Smith, an addiction medicine specialist, reviewed videotaped interviews of Lamb and Rump conducted on March 11 as well as a transcript of an interview with Harris conducted on March 9 and a videotaped interview with her conducted on March 18. Dr. Smith testified that methamphetamine can affect the user's ability to perceive time

and it appeared Harris was having trouble with regard to time references in her March 9 interview. As to Harris's taped interview, Dr. Smith opined that while Harris was not psychotic, she was "hyper" and clearly under the influence of amphetamine. In Dr. Smith's view, Rump was also under the influence of methamphetamine during his interview and was "crashing," or falling asleep, and was at the "rage, beginning of psychosis" stage of methamphetamine impairment. Lamb was less impaired and "was in the agitation, kind of anger/rage period." On an impairment scale of one to 10, with 10 being the most impaired, Dr. Smith would place Lamb at six and Rump at eight. Dr. Smith did not conduct a clinical analysis of Lamb, Rump, or Harris and his opinion was entirely based upon viewing the interview videos and reading the transcript.

Daniel Vasquez, a former correctional officer and state prison warden, testified as a prison and gang expert. Vasquez stated that a person "in the hat" would be "hit at the next and earliest convenience or opportunity," though the opportunity to exact payback could take months to present itself. Vasquez also testified that he would not expect a gang member to be carrying a firearm known to have been used in a recent homicide.

Frances Valdovinos testified that she was at Harris' apartment on the evening of March 8. When detectives later presented her with a photographic lineup that included Lamb, Valdovinos did not identify him as someone who had been at the apartment that night.

### 3. *Rebuttal Evidence*

Defense investigator George Rowell testified Bridges told him on June 4, 2007, that in the early morning hours after Miller's murder, Bridges said to Johnson, "Look me in the eyes

and tell me you didn't kill Scottish," to which Johnson responded, "You've been around. It's politics. There is nothing that could have been done about it."

Defense investigator Gail Greco testified that she interviewed Johnson in jail on July 5, 2006. Johnson told her: "I was there. I did it. They had nothing to do with this murder." Johnson mentioned he had previously told Rump's investigator that he had supplied the murder weapon. Johnson told Greco that he did not really know Lamb that well, but that he gave Lamb the gun at the bar the night after the murder, stating, "I ran into him at that bar, one convict to the other. I just happened to have one, that was it. This should clear the books."

Anaheim Police Officer David Heinzel arrived at the Miller murder scene a few minutes after midnight and spoke with neighbor Maria Baumgartner. Baumgartner stated that at around 10:50 p.m., she heard two gunshots and saw two people running in front of her residence.

The parties stipulated that Robin Freiwald told Anaheim detectives that Lamb and Rump were at her residence on March 8 from 7:00 p.m. until she went to sleep, and that during that time, they had all watched a movie together. Freiwald first stated that she went to sleep between 9:30 p.m. and 10:00 p.m.; she later said she went to sleep at 11:30 p.m. that night.

### B. Penalty Phase Retrial

At the penalty phase retrial, the parties presented largely the same evidence concerning the offenses that was presented at the guilt phase trial in addition to other evidence in aggravation and mitigation.

### 1. *Prosecution Evidence*

The prosecution presented evidence of Lamb's other criminal activity involving violence or the threat to use violence.

In 1995, Lamb was arrested after threatening a beachgoer at the San Clemente Pier. In 1996, Lamb and two other inmates attacked another prison inmate, beating him with closed fists resulting in an injury to the inmate's right eye requiring seven stitches. In 1999, Lamb stabbed an inmate with a metal shank in a prison culinary hall, resulting in a four-inch wound to the inmate's neck and an inch-long wound to his mid-back.

In 2003, a seven-inch-long metal shank, another piece of metal approximately three-and-a-half inches long, and two plastic lighters were found in Lamb's Orange County jail cell. In 2005, deputies discovered a six-inch metal shank hidden in Lamb's jail cell. As the deputies who conducted the search were leaving Lamb's cell, Lamb said, "Shank you later." In 2006, a shank was discovered embedded in Lamb's jail mattress.

The prosecution also presented evidence of Lamb's involvement in an alleged conspiracy to smuggle weapons and instruments of escape into jail, and to escape from jail.

Lamb also had suffered a juvenile adjudication for multiple vehicular burglaries, and adult felony convictions for vehicular burglary, marijuana sale, and the unlawful taking of a vehicle, as well as probation and parole violations.

The prosecution presented victim impact testimony from Miller's mother, Bonnie Miller, who testified about the impact her son's death had on her and Miller's grandmother, older brother, father, and his son who was born after his murder.

2. *Defense Evidence*

Lamb's parents, Cathy and Steven Lamb, his brothers, Daniel and Mathew Lamb, and his maternal aunt, Claudia Hayes, testified regarding his childhood.[4] Steven served in the Vietnam War and was dishonorably discharged for going AWOL and committing assault. Steven and Cathy married upon his return from the military and Lamb was born in 1973. Daniel and Matthew were born six and nine years later.

Lamb's father was verbally, mentally, and physically abusive during Lamb's childhood. Lamb was an exceptional baseball player, but Steven would publicly berate Lamb when he played. Lamb did not defend himself against Steven's physical abuse, which left welts on his body, but on one occasion, Lamb protected Daniel from one of Steven's beatings. Lamb's development was affected by his mother's chronic and debilitating alcoholism, which was recounted by numerous friends, neighbors, and family members. As a result, Lamb parented his younger siblings and shouldered household responsibilities. Others described Lamb as a polite and respectful neighbor, student, and friend.

Lamb also presented Vasquez to testify concerning prison gangs and conditions.

---

[4]    For clarity and not out of disrespect, relatives sharing Lamb's surname will be referred by their first names.

## II. PRETRIAL ISSUES[5]

### A. The Trial Court Did Not Err in Denying Lamb's Severance Motion

Before trial, Rump unsuccessfully moved to sever the Miller murder count from the Sergeant Helmick attempted murder count on the grounds that joinder would render the trial grossly unfair and result in a denial of due process. These counts had previously been consolidated without Lamb's objection. When Lamb later moved to sever the charges, the court noted, "[t]he counts are both pretty inflammatory," found that there was a significant amount of cross-admissible evidence, and ultimately denied the motion, commenting that the fact that Lamb was being prosecuted for a capital crime "does enter into it, but I don't think anything the defense has come up with has overcome the preference for consolidation."

Lamb concedes the offenses were properly joined under section 954 but now argues the trial court abused its discretion when it denied his motion to sever. We disagree.

A defendant may be charged with and convicted of "two or more different offenses of the same class of crimes or offenses, under separate counts . . . ." (§ 954.) The capital murder and attempted murder offenses are assaultive crimes against the

---

**5** "[A]s to many claims defendant[] allege[s] for the first time that the error complained of violated [his] federal constitutional rights. To the extent that in doing so defendant[] ha[s] raised only a new constitutional 'gloss' on claims preserved below, that new aspect of the claims is not forfeited. However, '[n]o separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of [the] constitutional theory . . . .' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364.)

person and are therefore of the same class of crimes within the meaning of section 954. (*People v. Jones* (2013) 57 Cal.4th 899, 924.) The statutory requirements for joinder having been met, Lamb " ' "can predicate error in denying the motion only on a clear showing of potential prejudice." ' " (*Id.* at p. 925.) We review the denial of severance under a deferential abuse of discretion standard. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1128.) "In reviewing such a ruling, we consider: '(1) whether evidence of the crimes to be jointly tried is cross-admissible; (2) whether some charges are unusually likely to inflame the jury against the defendant; (3) whether a weak case has been joined with a stronger case so that the spillover effect of aggregate evidence might alter the outcome of some or all of the charges; and (4) whether any charge carries the death penalty or the joinder of charges converts the matter into a capital case.' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 746.)

" ' "[T]he first step in assessing whether a combined trial [would have been] prejudicial is to determine whether evidence on each of the joined charges would have been admissible, under Evidence Code section 1101, in separate trials on the others." ' " (*People v. Jenkins* (2000) 22 Cal.4th 900, 948.) In the trial court, Lamb conceded "that there is some cross-admissibility issues with regard to the gun," but disputed that the attempted murder was probative of the homicide. In response, the prosecutor proffered it would argue that Lamb shot at Sergeant Helmick to evade being apprehended for the murder he committed three days prior. On appeal, Lamb maintains that the gun was the only common feature of the offenses, arguing the manner of the commission of the offenses

was radically different and insufficient to prove a common plan or scheme, identity, or intent.

In *People v. Merriman* (2014) 60 Cal.4th 1, 38 (*Merriman*), we held "[e]vidence that defendant, thinking he was being arrested for murder, fled from police and resisted arrest by engaging in a dramatic, hours-long standoff generally would be admissible at a separate trial on the murder charge to show his consciousness of guilt for killing [the victim]. Likewise, evidence of the murder generally would be cross-admissible in a separate trial on the resisting arrest charges to help explain the intensity of his efforts to evade police." (*Id.* at p. 44.) Similarly, in *People v. Cummings* (1993) 4 Cal.4th 1233 (*Cummings*), we held that the trial court did not abuse its discretion in denying a motion to sever robbery counts from the murder of a peace officer because the motive for the murder was to avoid arrest for the robberies, which was circumstantial evidence of premeditation and deliberation. (*Id.* at p. 1284.)

Lamb attempts to distinguish *Merriman* and *Cummings* by arguing that in both cases, the defendants knew they were being pursued by the police for a previous crime, whereas there was no evidence Lamb knew his pursuers were law enforcement officers. Lamb's argument misses the mark. In *Merriman*, we rejected the defendant's contention that the evidence was not cross-admissible because there were any number of reasons why defendant would have fled the police other than a consciousness of guilt for the murder. (*Merriman*, *supra*, 60 Cal.4th at p. 44.) Here, too, such an argument "demonstrates only that the evidence proffered by the prosecution regarding defendant's motive for evading police was disputed by the defense," and Lamb "points to no case, and we have located none, suggesting that a finding of cross-admissibility is an abuse of discretion

simply because the defense has challenged the inferences that may be drawn from the proffered evidence." (*Ibid*.) While Lamb argued in closing the evidence demonstrated he and Rump did not know they were being pursued by peace officers, there was sufficient evidence demonstrating otherwise such that it cannot be said the trial court erred in finding cross-admissible evidence.

Though not "a precondition to joinder of charges" (*People v. O'Malley* (2016) 62 Cal.4th 944, 968), cross-admissibility " 'is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges.' " (*Merriman*, *supra*, 60 Cal.4th at p. 38.) An examination of the remaining factors only further reinforces the propriety of the trial court's refusal to sever.

Neither the murder count nor the attempted murder count was more inflammatory than the other. Lamb argues the inflammatory nature of the attempted murder worked to his disadvantage in the murder charge, claiming, "the specter of an armed gang member shooting at an officer of the law is perhaps considered more nefarious than any act other than a crime against a child." We disagree. Shooting an individual in the back of the head is also inflammatory conduct. Both the murder and the attempted murder involved a single gunshot at a single victim, with one killing the victim, and the other missing the victim. While Sergeant Helmick may have been a more sympathetic victim than Miller, Helmick was unscathed in the attack. Under these circumstances, we cannot say that the attempted murder charge was "particularly likely to inflame the jury against" Lamb. (*People v. Thomas* (2012) 53 Cal.4th 771, 799; see also *People v. Capistrano* (2014) 59 Cal.4th 830, 850–851.)

Nor was the murder charge a weak case bolstered through joinder such that the spillover effect altered the outcome. Lamb contends the evidence of the attempted murder was much stronger than the murder in that the former involved questions of intent rather than identity, while the opposite was true for the murder. Not so.

There was strong evidence of Lamb's identity as Miller's killer. The gun Lamb used to shoot at Sergeant Helmick was identified by a forensic firearm examiner as the gun used three days before at the scene of Miller's murder. Lamb boasted to Mason that he had killed Miller. Other evidence included Lamb's need to speak with Hinson about something important on the night of the murder, Lamb's later presence at Harris's apartment located next to the murder site, and Lamb's departure from the apartment shortly before the murder. As to the attempted murder, Lamb was identified as the gunman and the surrounding circumstances, including Detective Allen's police jacket and the loud police helicopter hovering overhead, demonstrated that he knew he was shooting at a peace officer. This evidence "defeats the notion that strong evidence of one inflammatory crime was improperly used to bolster any weak evidence supporting the other crime." (*People v. Westerfield* (2019) 6 Cal.5th 632, 691; see also *People v. Scott* (2015) 61 Cal.4th 363, 396 ["the potential for a spillover effect was minimal" from nonmurder to murder charge, where evidence of the murder "was also substantial"].) Accordingly, Lamb was not prejudiced by any spillover effect.

Nor did joinder of the attempted murder and murder charges render Lamb eligible for the death penalty or convert the matter into a capital case. (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1228–1229; see also *People v. Simon* (2016) 1

Cal.5th 98, 128–129 (*Simon*) [where one of two joined incidents would independently give rise to a capital charge, there is less risk of prejudice].) In sum, Lamb has not shown prejudice to establish that the trial court abused its discretion by denying his pretrial severance motion.

Lamb further contends joinder of the attempted murder and murder charges, in hindsight, resulted in gross unfairness amounting to deprivation of a fair trial or a denial of due process at the guilt phase. (See *Simon*, *supra*, 1 Cal.5th at p. 123 ["[E]ven if the trial court's ruling was proper as a matter of state law, we will reverse the judgment if the defendant shows that joinder of the charges actually resulted in 'gross unfairness' amounting to a denial of due process during the guilt phase"].) "Whether joinder worked a gross unfairness turns upon assessing whether it was 'reasonably probable that the jury was influenced by the joinder in its verdict of guilt.'" (*People v. Vargas* (2020) 9 Cal.5th 793, 819.) Here, the trial evidence was similar to that before the court when it ruled on defendant's severance motion, and "'strong evidence warranting conviction' supported all the charges." (*Ibid*.) Hence there is no reasonable probability that the guilt verdict would have been different if evidence regarding the attempted murder had not been introduced and no gross unfairness at trial occurred.

### B. We Need Not Reach Lamb's Claim That the Gang-murder Special Circumstance Is Unconstitutionally Vague or Insufficiently Narrowing

Lamb contends the gang-murder special circumstance[6] is unconstitutionally vague and fails to sufficiently narrow the offenses in which the death penalty may be imposed. (§ 190.2, subd. (a)(22).) He asserts there is no meaningful distinction between a first degree murder charge with a gang enhancement and a substantive gang offense, and a murder charge with a gang-murder special circumstance.

As discussed below, we conclude that the gang-murder special circumstance and death judgment must be vacated due to the changes to section 186.22 from Assembly Bill No. 333. Accordingly, Lamb's challenge to the constitutionality of the gang-murder special circumstance is moot, and we need not address this claim.

### III. GUILT PHASE

### A. The Trial Court Did Not Err in Admitting the Fox Videos

On February 20 and 21, 2001, Fox 11 News broadcast two video segments described as an undercover report "expos[ing] [PEN1] for the first time on TV." Lamb contends the Fox videos were irrelevant and unduly prejudicial. Although the question

---

[6] Section 190.2, subdivision (a)(22), or the gang-murder special circumstance, provides, "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."

is close, we conclude the trial court did not abuse its broad discretion in admitting the videos.

### 1. Factual Background

#### a. Fox 11 News videos

The two videos collectively ran about 12 minutes. In the first video, after the reporter introduces PEN1 as a gang "increasing recruitment efforts in the ranks of white supremacist skinheads" and making a push for power in prison and out on the streets, Miller[7] appears with his pit bull. Amid images of dogs fighting and a tattooed Miller holding and firing a gun, Miller discusses using his dog as a weapon and owning over 300 guns. Miller is described as a shot caller in PEN1, and the reporter describes the gang as "ready to kill enemies and snitches." The video then explores the origins of PEN1 and its place in the white supremacist skinhead movement accompanied by images of PEN1 graffiti, PEN1 and other white supremacist tattoos, including swastikas, and gang members making Nazi salutes. The video cuts to Miller saying, censored for broadcast, "F___ that n_____" while shooting at a target. It also portrays PEN1's drug activity by featuring law enforcement, unknown gang members, and Miller discussing selling and using methamphetamine alongside imagery of drug use, paraphernalia, and a cabin destroyed in a methamphetamine manufacturing accident.

As the video shifts to describing PEN1's efforts to recruit new members and "strengthen their position among other white

---

[7] Although Miller's appearance and voice were disguised in the videos, it was stipulated that the person in question featured in the video was Miller. Also, as noted *ante* in part I.A.1.e., Johnson and others immediately recognized Miller in the videos.

criminal elements," a correctional officer states, "[t]hese groups are going to start popping up everywhere and they are . . . extremely violent." Accompanied by more images of swastika tattoos and Nazi-saluting gang members, the reporter states PEN1's "die on your shield philosophy . . . fits well with a group that has evolved from punk rockers to racist skinheads to a gang of thugs moving into organized crime." Miller reappears with his pit bull and states: "In this business it's guns, speed, violence and sex. That's what it's all about." The first video concludes with a preview of the next with the reporter claiming, "[l]aw enforcement sources say there is an alarming chain of events launching PEN1's power, causing an alliance with another well known white supremacist group and threatening to beef up PEN1's influence in prison yards and out in the street."

In the second video, which aired the following day, the reporter states that PEN1 is "now positioning themselves as a criminal force inside prison walls," and that "cops say PEN1 violence can already reach from prison yards to neighborhood streets." Alongside images of PEN1 president Mazza's mugshots and racist tattoos, the video describes an incident in which Mazza was released from prison in 1999 and within five hours he was back in Orange County smoking methamphetamine and beating and stabbing a gang dropout. A correctional officer states, "[t]his particular group has a very great potential for violence and are pretty much unpredictable when that violence may occur."

Accompanied by images of prisons, tattooed prisoners exercising, white supremacist gang graffiti and tattoos, and a burning and spinning swastika, the video then discusses PEN1's rise to influence within the prison system, explaining that with

members of the Aryan Brotherhood locked away in special units at maximum security prisons, the Nazi Lowriders began running the prison yards "and calling the shots for white Nazi gangs out in the streets." However, when the Department of Corrections named the Nazi Lowriders a prison gang in 1999, its members were also locked down in special security cells, which according to the reporter, "has opened a prison door for PEN1."

After stating that PEN1 leaders Mazza, Rizzo, and Stringfellow formed alliances with the Aryan Brotherhood and Nazi Lowriders, and that they "[a]ll still embrace their white supremacist philosophy," the video states PEN1 "are now modeling themselves into a more seasoned prison gang" with their main goal being to profit from drug sales. Miller then appears alongside images of drugs and bullets on a table, and states, "I sell it for 125 dollars an 8-ball," and "[i]t's a white man's drug." The video then shifts to discussing PEN1's efforts to expand into other counties and prisons, and describes a violent assault committed by 18-year-old PEN1 member Bryan O'Leary against an ex-white supremacist in Huntington Beach. With images of Miller's fist with brass knuckles, the reporter states, "[t]here is no doubt that PEN1 figuratively and literally have put on white supremacist brass knuckles," after which Miller declares: "If I sock you with this, you're not going to get up. I guarantee that."

At the video's conclusion the reporter states: "And gang investigators guarantee that PEN1 has already moved beyond its neo-Nazi beginnings into organized crime. At the same time, attorneys for reputed PEN1 leaders Donald Mazza and Dominic Rizzo say their clients are not guilty of conspiracy to murder charges that they now face in Orange County and they quote,

look forward to the truth coming out at trial, and that's scheduled to begin next week."

### b. *Admissibility argument and ruling*

Before trial, the prosecutor sought to introduce the Fox videos on the ground they were probative of the "motivation behind the murder of Scott Miller." Rump, joined by Lamb, objected to the videos on the ground they were unduly prejudicial because Miller rarely appeared in the videos and the videos had "a lot of media hype" to make PEN1 "look like the most dangerous thing out there."

The trial court expressed concern that the prosecutor had substituted a television program for the testimony of an expert with no opportunity for cross-examination, and that certain images were prejudicial: "We've got cross burnings. We've got swastikas. We've got attack dogs. We've got methamphetamine. We've got people being accused of murder. We've got allegations of association with Nazi Lowriders, with Aryan Brothers. How much more inflammatory could it get?" However, the court was ultimately persuaded that the probative value of demonstrating a motive to kill Miller was not substantially outweighed by the prejudice, finding the videos relevant to proving the requisite knowledge for the street terrorism charge as well as supplying the motive for the homicide. (Evid. Code, § 352.)

At Lamb's request, the trial court admonished the jury on the limited purpose of the videos as follows: "Evidence consisting of news segments aired by Fox 11 News was introduced during the trial. This evidence was presented to you for limited purposes. By admitting this evidence the court is not advising you that it actually goes towards proving any issue in

this case; that determination is to be made by you. The news broadcast contains images of bigotry, opinions by certain individuals, inflammatory remarks by purported gang members and sensationalism by newscasters. You may not consider the recording as proof of the truth of any statements made by anyone during the recording. The information contained in the news segments is relevant for two purposes only: 1. Did a defendant view either broadcast and if so did the broadcast serve to notify that defendant that members of PEN1 engage in criminal activity? 2. Did the airing of the broadcast provide a motive for the killing of Scott Miller? You may not consider anything contained on the recording for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime." The prosecutor read the admonishment to the jury prior to playing the videos during his guilt phase opening statement. The videos were admitted into evidence at the conclusion of the prosecution's case-in-chief. The court repeated the limiting instruction and admonishment during guilt phase instruction, and it was included in the written instructions provided to the jury.

### 2. *Analysis*

"Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.) Relevant evidence is that which has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Lamb contends the Fox videos were irrelevant because — as the prosecutor conceded in his closing argument — there was no direct evidence that Lamb had seen the videos prior to Miller's death. Nor, contrary to the prosecutor's opening statement, was any evidence introduced

that Mazza had ordered that Miller be killed. Lamb further argues that because the videos were broadcast over one year before Miller's murder, they are not probative of Lamb's motive to kill. We disagree.

In *People v. McKinnon* (2011) 52 Cal.4th 610, 656, we held evidence of rumors that the victim had killed a member of the defendant's gang was admissible to establish the defendant's motive for killing the victim more than a year later. In doing so, we rejected the defendant's argument that the evidence was inadmissible "simply because the prosecution failed to establish, by direct means, that defendant had heard the rumors about [the] death or the gang-related circumstances surrounding it. Ample evidence confirmed defendant's gang membership, his gang identity, and his association with other gang members . . . ." (*Ibid.*) Under these circumstances, "the jury could readily infer defendant's familiarity with the information . . . that was circulating 'on the street.' " (*Ibid.*) Here, too, although there was no direct evidence Lamb watched the Fox videos, there was other evidence from which the jury could readily infer Lamb's familiarity with the videos, including his membership in PEN1, where it was known that Miller had appeared in the videos.

Additionally, Lieutenant Epperson testified that the time between an act of disrespect and payback can sometimes be lengthy and that he had investigated cases where payback was enacted years after a disrespectful act. Mason testified there was an understanding within the gang that "something" was supposed to happen to Miller as a result of the Fox videos, and Lieutenant Epperson was also aware of a recurring rumor that Miller would be killed for participating in the videos. The jury

could reasonably infer that Lamb was also aware of Miller's participation in the Fox videos and their import.[8]

Lamb contends that the videos should have been excluded under Evidence Code section 352, which provides that a trial court, "in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We review a trial court's decision to admit evidence under Evidence Code section 352 for abuse of discretion, and "do not disturb the trial court's ruling unless it was arbitrary, capricious, or made in a ' "patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Thomas* (2023) 14 Cal.5th 327, 358; see *People v. Doolin* (2009) 45 Cal.4th 390, 439 (*Doolin*) [" 'In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose' "].)

---

[8] Aside from motive, the Fox videos were also admitted as probative of Lamb's knowledge that PEN1 engaged in criminal activity, which was an element of the street terrorism charges. (§ 186.22, subd. (a).) The question of whether the court erred in admitting the videos for this purpose is moot given our conclusion below that the gang convictions must be reversed due to the changes to section 186.22 occasioned by Assembly Bill No. 333.

Lamb argues the Fox videos were unduly inflammatory and created the substantial likelihood that the jury would use them for an illegitimate purpose. He relies upon *People v. Diaz* (2014) 227 Cal.App.4th 362. There, the defendant was convicted of second degree murder arising out of a fatal car crash in which defendant was driving with a 0.21 blood-alcohol level after having been twice convicted for driving with an elevated blood-alcohol level. (*Id.* at pp. 366–368.) Two videos that the defendant had viewed at mandatory alcohol education programs that explored the consequences of alcohol-related driving offenses and the impact they had on victims' families were played for the jury. The Court of Appeal concluded admission of the videos was error as they "created a substantial danger of inflaming the jury's passions by engendering similar feelings of sympathy for the victims of the charged offenses and their families," and contained "numerous images that serve to heighten the emotional impact of the videos" as well as "numerous statements that were entirely irrelevant to the case, and were highly prejudicial in that they suggested to the jury that it would be acting in an aberrant fashion if it were to find [the defendant] not guilty." (*Id.* at pp. 380, 381.)

*Diaz* is distinguishable here. The Fox videos, although graphic, had substantial probative value in establishing motive. Indeed, that Miller described PEN1's criminal enterprise in sensationalized videos aired shortly before two of the gang's founders were set to go to trial is highly relevant evidence of motive, which "makes the crime understandable and renders the inferences regarding defendant's intent more reasonable." (*People v. Roldan* (2005) 35 Cal.4th 646, 707.) Thus, the Fox videos were not introduced simply to improperly elicit strong

emotion and are substantially more probative than the videos in *Diaz* so as to outweigh their prejudicial effect.

The videos contained graphic and disturbing material and were played in the prosecutor's opening statement. The prosecutor admitted the material was disturbing and the trial court expressed concern over the videos' potential prejudice. However, Evidence Code section 352 " 'speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or time consumption " 'substantially outweigh' " the probative value of relevant evidence, a[n] [Evidence Code] section 352 objection should fail.' " (*Doolin, supra*, 45 Cal.4th at p. 439.) Although Lamb argued in the trial court that the prosecutor's theory of the case could be accommodated through other means or that portions of the videos should be redacted,[9] "the 'persuasive power of the concrete and particular is often essential to the capacity of jurors to satisfy the obligations that the law places on them.' " (*People v. Marks* (2003) 31 Cal.4th 197, 227 (*Marks*).) The jury was entitled to view what the prosecutor theorized and witnesses confirmed was the motivation for murder, and the Fox videos and the inflammatory content contained therein "assisted the jury in understanding" the motivation for the crime, "and the People were entitled to employ such evidence to prove their case." (*Ibid.*)[10] Lamb has

---

[9] Lamb does not argue on appeal that the videos should have been redacted.

[10] The Attorney General argues the videos were not unduly prejudicial because the evidence was "case-neutral" in that the defense attempted to portray Johnson as the person who killed Miller partially because of his participation in the Fox videos. Lamb argues we should reject this argument because his

failed to demonstrate that the probative value of the Fox videos was substantially outweighed by a substantial danger of undue prejudice to constitute an abuse of discretion.

Additionally, " '[a] limiting instruction can ameliorate [Evidence Code] section 352 prejudice by eliminating the danger the jury could consider the evidence for an improper purpose.' " (*People v. Gonzalez* (2021) 12 Cal.5th 367, 409.)  Here, the court instructed the jury multiple times that the Fox videos contained images of bigotry, opinions by certain individuals, inflammatory remarks by purported gang members, and sensationalism by newscasters.  It also instructed the jury it was not to consider the videos as proof of the truth of any statements made by anyone in the recording or for any purpose other than that provided, nor were they to conclude that Lamb was a person of

_____

defense did not depend on playing the videos, much of the content was irrelevant to prove motive, and their inflammatory nature would not assist the defense case.  However, the *trial court*, irrespective of the defense theory, could validly consider the fact that the videos provided "case-neutral" evidence of motive for PEN1 members generally, which would include Johnson, when evaluating the risk of prejudice under Evidence Code section 352 to Lamb.  This is a unique scenario where the challenged inflammatory evidence could actually raise some doubt as to the identity of the perpetrator and thereby neutralize the risk that the jury would improperly "prejudge" Lamb himself and "reward . . . *one side* because of the jurors' emotional reaction."  (*People v. Bell* (2019) 7 Cal.5th 70, 105, italics added.)  Although we do not conclude that Lamb acquiesced to the prejudicial nature of the video simply because defense counsel attempted to make the best of an adverse ruling (see *People v. Calio* (1986) 42 Cal.3d 639, 643), we observe that in conducting an Evidence Code section 352 analysis, the trial court was not precluded from considering the fact that at least certain aspects of the videos were not prejudicial, and perhaps even helpful, to Lamb.

bad character or disposed to commit crimes.  The prosecutor read this admonition prior to playing the videos during his opening statement and iterated that they were being introduced for a very limited purpose, and the admonition was again read during guilt phase instruction and included in the written instructions.  We presume that the jury understood and followed these instructions.  (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1178.)

Lamb contends the admonition was insufficient to avoid undue prejudice, because "the prejudicial evidence presented to the jury is a sensationalized mass-media presentation designed to incite an emotional rather than a rational reaction, and to instill fear into the jurors personally because of the gang's threat to the public at large." (Fn. omitted.)  However, the admonition explicitly confronted and addressed the particularized complained of potential prejudice.

Even assuming the videos were erroneously admitted, we conclude it is not reasonably probable that a result more favorable to Lamb would have been reached absent the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)  Lamb argues that the admission of the Fox videos was so prejudicial that it violated his federal constitutional rights to due process and a fair trial, and that we should therefore apply the standard of review in evaluating the harmlessness of the alleged violations of the federal Constitution set forth in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*), which requires reversal unless the error is " ' "harmless beyond a reasonable doubt." ' " (*People v. Schuller* (2023) 15 Cal.5th 237, 251.)  "But the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*." (*People v. Partida* (2005) 37 Cal.4th 428, 439; see also

*Marks*, *supra*, 31 Cal.4th at p. 227 [the application of ordinary rules of evidence like Evid. Code § 352 does not implicate the federal Constitution and thus we review such allegations of error under *Watson*].)  Regardless, even if the admission of this evidence were viewed as a due process violation, it would be harmless under either standard.

As observed *ante* in part II.A., there was strong evidence of Lamb's guilt.  Lamb told Mason he had killed Miller, he was in possession of the murder weapon a few days after the murder, and he was present with Rump at an apartment adjacent to the murder location and departed shortly before the murder.  Other evidence, including Mason's and Lieutenant Epperson's testimony, demonstrated that Lamb was a PEN1 member and had a related motive for the killing.

In addition, substantial other evidence of PEN1's bigotry and violent criminal activities was introduced at trial.  While the Fox videos contained incendiary images of racist symbols and white supremacist emblems, there was evidence shown to the jury that Lamb had such imagery tattooed on his own body.  The jury was aware Lamb had the words "blood" and "honor" with a swastika in the middle around his neck, another swastika under his right eye, yet another swastika on his right arm, a Celtic cross with "skin" tattooed on top of it, "P.D.S." (for PEN1 Death Squad) on top of his right eye, "L.A.S." (for Los Angeles Skins) on his left arm, "W.P." (for white power or pride) on his back, and "Death Squad" on his leg.

In addition, Lieutenant Epperson testified that PEN1 had become one of the fastest growing white racist gangs in Southern California and in the California prison system.  PEN1 was antisemitic and tended to hate any nonwhite racial group.

Lieutenant Epperson also testified that PEN1 hated law enforcement and government because they viewed them as Zionist organizations established to suppress Aryans. Likewise, Johnson testified that he gave a Nazi salute while in court on a separate case and referred to the courthouse as the "house of the Jews."

The methamphetamine sale and use depicted in the Fox videos was substantiated by Lieutenant Epperson's testimony concerning his personal knowledge of PEN1's sale and use of the drug. Lieutenant Epperson's expert testimony also covered the relationship between PEN1, the Aryan Brotherhood, and the Nazi Lowriders discussed in the Fox videos.

Accordingly, although the Fox videos were offensive and graphic, their contents were largely proven by other properly admitted evidence at the guilt phase. (See *People v. Riccardi* (2012) 54 Cal.4th 758, 828–830.) Given these circumstances, any error was harmless.

## B. Admitting Rump's Jailhouse Statement Was Not Reversible Error

Lamb argues a recording of a jailhouse conversation between himself and Rump was erroneously admitted under state hearsay law and violated his confrontation right under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), *Bruton v. United States* (1968) 391 U.S. 123, and *People v. Aranda* (1965) 63 Cal.2d 518. We see no constitutional error and hold harmless any state law error.

### 1. *Background*

When Lamb and Rump were arrested, they were placed in separate interview rooms and videotaped yelling back and forth to each other. During this time, Rump asked Lamb, "[w]ho the

fuck was that dude in the white car trying to get our ass?" Lamb responded, "I don't know." Soon after, a detective entered Lamb's room and Lamb yelled to Rump: "Hey, hold on dog. I got tell them I got nothing to say." Afterward, Rump yelled, "I think that white car might have been a parole agent," and Lamb said, "I'm out of here Comrade." Rump then stated: "I thought, I thought he was trying to hit me, though. Hello. Where did you go?" Lamb responded, "[bye] homie."

Before trial, the prosecutor moved to introduce Rump's statement that he thought he and Lamb were being pursued by a parole officer, and Lamb objected, arguing the evidence was irrelevant, speculative, and did not constitute an adoptive admission. As to Rump, the court ruled the statement would be relevant to establish knowledge for the attempted murder charge noting a parole officer qualifies as a peace officer. The court also found that the statement did not qualify as an adoptive admission by Lamb but otherwise reserved ruling on its admissibility against Lamb until the presentation of evidence.

During his opening statement, the prosecutor asserted Lamb and Rump knew they were being overheard. Referencing the statement that Rump believed the man in the white car was a parole agent, the prosecutor stated Rump "is thinking about the excuse they wanted to come up with for running from the officers."

During testimony about the recorded conversation, the prosecutor moved to admit the recording into evidence. Defense counsel indicated no objection "other than as stated" and the court admitted the video and a transcript.

The court revisited the issue prior to the close of evidence and ultimately found that the "statement is arguably hearsay, but technically it's not. The relevance of the statement is the possible proof of the defendant's knowledge of intent, not for the truth that the person in the white car was actually a parole officer. Even if it were hearsay, the declaration-against-penal-interest exception would apply." The court also found the statement was not testimonial. The court indicated it would admonish the jury that if the statement constituted an admission it could be considered as such only against Rump, and it could only be used against Lamb for the purpose of determining that such statement is circumstantial evidence that Lamb had a motive to commit the crime of attempted murder on a peace officer.

During his closing argument, the prosecutor argued that Rump's statement was contrived and that "[t]he reason why they were running is because they figured out somebody realized they killed Scott Miller." The prosecutor also asserted that Lamb and Rump were worried that someone had seen them commit the murder or knew they were responsible, "[a]nd that's why Mr. Rump comes up with the story, 'well, we'll say that's a parole officer.'" The prosecutor noted that a parole officer is a peace officer and that the statement "hurts both ways" because it demonstrated both their knowledge that they were being pursued by a peace officer, "[b]ut more importantly, it's consciousness of guilt relating to the March 8th incident. 'That white car is a parole officer; let's make that our story.'" However, the prosecutor conceded that there was no evidence Lamb had heard the statement.

On rebuttal, the prosecutor again argued the reason Rump made the statement was "not because he wants to tell us about

parole agents, but because they're thinking about excuses for why they were running from the cops. 'Let's float this idea: we ran because we're parolees at large and this is a parole agent.' "

The court instructed the jury in the modified language of CALCRIM No. 305: "You have heard evidence that the defendants made oral and written statements before trial. You may consider that evidence only against the defendant who made the particular statement and not against the other defendant. There is one exception to this instruction. Evidence was presented that Mr. Rump made a statement to Mr. Lamb while both were incarcerated in the Anaheim City Jail. Such statement was 'Hey I think that white car might have been a parole agent.' You must determine 1) whether such statement is circumstantial evidence that Mr. Rump knew he was being pursued by a peace officer on March 11, 2002 and 2) if it is, whether that statement is also circumstantial evidence that the defendant Lamb had the motive or intent to commit the crime of attempted murder on a peace officer."

### 2. *Analysis*

Lamb contends Rump's statement was introduced against Lamb for the truth of the matter stated in violation of his state hearsay and federal confrontation clause rights.

As to state law, the trial court ruled the statement was nonhearsay "as possible proof of the defendant's knowledge of intent, not for the truth that the person in the white car was actually a parole officer." Even if hearsay, the court found the statement constituted a declaration against penal interest, and then stated the jury would be admonished it could only be considered an admission against Rump and circumstantial evidence of motive as to Lamb. However, the modified

instruction stated the evidence could be used as circumstantial evidence that Rump knew he was being pursued by a peace officer and that Lamb had the "motive or intent to commit the crime of attempted murder on a peace officer."

Accordingly, the convoluted arguments and rulings lack clarity, as evidenced by the parties' positions on this issue. The Attorney General claims the statement is not hearsay because it was not offered to prove that Lamb and Rump were being pursued by a parole officer because the pair were in fact being pursued by a police officer. Lamb contends the statement was admitted for the truth of Rump's *belief* that they were being pursued by a parole officer, which would constitute hearsay.

However, even if we were to assume the trial court erred in admitting Rump's statement against Lamb, it is not reasonably probable the outcome would be different absent the error considering other evidence that Lamb knew or reasonably should have known they were being pursued by police. Though Sergeant Helmick and Detective Allen were driving unmarked vehicles, Lamb and Rump engaged in a headlong flight after Rump observed Sergeant Helmick in his side-view mirror. During the foot pursuit, an extremely loud police helicopter was hovering overhead and though the pursuing officers were in plain clothes, both were holding their radios, had their guns drawn, and were wearing some indicia of their status as law enforcement.

Additionally, the admission of Rump's statement did not violate the federal confrontation clause, and *Crawford* and the

*Aranda-Bruton* doctrine are inapplicable here.[11]  Out of court statements that are not offered for their truth are not hearsay (Evid. Code, § 1200) and no further *Crawford* analysis is required.  (*People v. Cage* (2007) 40 Cal.4th 965, 975, fn. 6 (*Cage*) ["*Crawford* made clear that there are no confrontation clause restrictions on the introduction of out-of-court statements for *nonhearsay* purposes"], citing *Crawford, supra*, 541 U.S. at p. 60, fn. 9.)  However, even if Rump's statements were admitted for their truth, they would not qualify as testimonial statements as that term has been articulated by the high court.  (See *Cage*, at p. 981 ["the confrontation clause is concerned *solely* with hearsay statements that are testimonial"], citing *Davis v. Washington* (2006) 547 U.S. 813, 823–825.)  Inter alia*,* the colorful and informal remarks between the two suspects shouted through the interview room walls are not sufficiently formal to meet that prong of the *Crawford* test.  Further, they were not made by their declarants for the primary purpose of preserving evidence for later use at trial.  (See *Ohio v. Clark* (2015) 576 U.S. 237, 243–249 [for a summary of its own jurisprudence and the evolution of the proper understanding of what circumstances can render a statement "testimonial"].)  "Thus, binding high court precedent requires us to hold that the Sixth Amendment

---

[11]    We have held that "[t]o the extent that our decision" in *Aranda,* regarding redaction or exclusion of the out-of-court confession of a defendant that implicates a codefendant, "constitutes a rule governing the admissibility of evidence, and to the extent this rule of evidence requires the exclusion of relevant evidence that need not be excluded under federal constitutional law, it was abrogated in 1982 by the 'truth-in-evidence' provision of Proposition 8 (Cal. Const., art. I, § 28, subd. (d) [now subd. (f)(2)])."  (*People v. Fletcher* (1996) 13 Cal.4th 451, 465.)

is inapplicable and that defendant's confrontation clause claim therefore fails." (*People v. Cortez* (2016) 63 Cal.4th 101, 129; see also *People v. Tran* (2022) 13 Cal.5th 1169, 1196 (*Tran*) ["In sum, because the confrontation clause applies only to testimonial hearsay statements, the *Aranda-Bruton* doctrine's Sixth Amendment protections likewise apply only to testimonial hearsay statements"].)

### C. The Firearm Examiner's Testimony Did Not Violate *People v. Sanchez*

Lamb argues that the firearm expert's testimony improperly relayed information from a report prepared by a nontestifying firearms examiner, in violation of *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). We disagree.

#### 1. *Background*

The prosecution called Rocky Edwards, a forensic firearm and toolmark examiner employed by the Santa Ana Police Department. Edwards testified that he was familiar with Laurie Crutchfield, a firearm examiner with the Orange County crime lab, and that she had previously conducted an examination of ballistic evidence in this case. However, in April 2007, Edwards became aware that defense counsel wanted him "to do a reexamination of the evidence from the beginning" to see what conclusions he would reach, and that as a result of the defense request, the prosecutor arranged to have Edwards reexamine "from the beginning all of the evidence . . . ."

Edwards testified that he reviewed Crutchfield's report prior to his examination. In doing so, Edwards discovered that Crutchfield found the firearm to operate normally and noted the magazine to have a maximum capacity of 13 bullets. Edwards also confirmed that Crutchfield's report concluded the following:

a casing found inside the gun had been fired by that gun; the casing found at the homicide scene had been fired by that same weapon; the bullet core recovered from the inside of Miller's head did not have enough characteristics to reach a conclusion; and the bullet jacket recovered from Miller's head had enough characteristics "for her to conclude that it's consistent as being fired from the weapon, but not enough for her to give a complete match . . . ."

Edwards explained the scientific basis for determining whether a specific bullet or cartridge case was fired by a specific weapon and stated that he "need[s] overwhelming agreement before I'll make a determination." Edwards described how he conducted his examination, which included test firing the weapon to test its functionality and to recover fired bullets and casings for comparison purposes.

Edwards concluded that the weapon functioned properly and that he had "zero doubt" that the two cartridge cases submitted for examination were fired by the handgun. The bullet jacket had the same "class characteristics" as the gun but had "insufficient individual characteristics for comparison" to make a conclusive determination as to whether it had been fired by the handgun. Examination of the bullet core was also inconclusive. Edwards also testified that an expended casing found inside the gun may not have ejected because some external force impeded the movement of the slide, possibly a white bandana wrapped around the grips. Edwards explained that this did not contradict his and Crutchfield's conclusion that the weapon functioned properly when test fired.

### 2. *Discussion*

In *Sanchez*, we "adopt[ed] the following rule: When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. . . . If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Sanchez*, *supra*, 63 Cal.4th at p. 686; see *Crawford*, *supra*, 541 U.S. at pp. 62, 68.)[12]

First, it is unclear whether Edwards's testimony concerning Crutchfield's conclusions runs afoul of *Sanchez*, as there is no indication that Edwards told the jury that he relied upon Crutchfield's report as a basis for his opinion or suggested that the jury rely on the report's content because Edwards considered Crutchfield's statements to be true. (*Sanchez*, *supra*, 63 Cal.4th at pp. 684–685; see also *id.* at p. 682 ["When an expert relies on hearsay to provide case-specific facts, considers the statements as true, and relates them to the jury as a reliable basis for the expert's opinion, it cannot logically be asserted that the hearsay content is not offered for its truth"].) Though Edwards testified that he had reviewed the report and relayed its conclusions to the jury, Crutchfield's opinions were not presented or relied upon as the basis of a hypothetical question. Nor did Edwards indicate that he relied upon Crutchfield's examination or agreed with her conclusions, aside from relating

---

[12] Though no objection was raised in the trial court, a failure to object here does not forfeit Lamb's *Sanchez* claim on appeal. (*People v. Perez* (2020) 9 Cal.5th 1, 9.)

his own conclusions without reference to Crutchfield's. Indeed, Edwards confirmed that he "did a complete, thorough and from the beginning examination of this weapon . . . independent of what Miss Crutchfield did . . . ." It was also made clear that his opinion was based upon his own original, independent examination at the behest of defense counsel.

Thus, it appears that testimony about Crutchfield's report was admitted not to bolster Edwards's opinion, but to explain the context in which Edwards was brought into the case as an independent expert and to establish that his opinion was not influenced by the earlier examination. The truth of Crutchfield's conclusions was immaterial to Edwards. "Neither the hearsay doctrine nor the confrontation clause is implicated when an out-of-court statement is not received to prove the truth of a fact it asserts." (*Sanchez*, *supra*, 63 Cal.4th at p. 681, citing *Crawford*, *supra*, 541 U.S. at p. 59, fn. 9.)

Nevertheless, Crutchfield's conclusions were admitted without limitation, and the record is silent as to whether they were admitted as nonhearsay or under an exception to the hearsay rule. Assuming that admission was erroneous under *Sanchez* or *Crawford*, any error is harmless beyond a reasonable doubt. (*Sanchez*, *supra*, 63 Cal.4th at p. 698.)

Edwards's conclusions were uncontroverted and supported by testimony concerning his extensive expertise, the science of firearm and toolmark comparison, the examination he undertook, and the independent bases for his conclusions. Though we acknowledge the potential for Edwards's conclusions to be bolstered in that they comported with another firearm examiner's findings, that danger is mitigated both by evidence of Edwards's independent analysis and evidence that he was

sought by defense counsel to reexamine the ballistics evidence "from the beginning." Indeed, in closing, Lamb's counsel argued: "Rocky Edwards is the expert. That's why I wanted Rocky Edwards."

Lamb's reliance on the Court of Appeal's decision in *People v. Azcona* (2020) 58 Cal.App.5th 504 (*Azcona*) does not compel a different result. Lamb argues that "Crutchfield's hearsay conclusions, testified to by Edwards, infected the jury with the false sense that his conclusions had been vetted or confirmed by the first analyst, an impression underscored by his statements about there being 'zero doubt' as to his conclusions, and that no other possible result could have been reached." In *Azcona*, a firearms expert testified to his opinion that two bullet casings were fired from the same gun. (*Id.* at p. 510.) When asked how he ensured his work was correct, the expert explained his work was reviewed and approved by his supervisors " 'for technical aspects in the report to be sure I had everything correct in my work and I didn't transpose anything . . . .' " (*Id.* at p. 514.) On appeal, the defendant argued this testimony violated his confrontation rights. (*Ibid.*) The appellate court agreed, holding that the expert related testimonial hearsay statements that presented case specific facts "when the expert told the jury that another examiner had indicated approval of and agreement with the expert's conclusions in this case. The prosecution was in effect able to introduce the opinion of a second expert without exposing that witness to cross-examination, depriving defendant of his Sixth Amendment right of confrontation." (*Id.*)

That is not what happened here. Edwards's examination and opinion were not reviewed or approved by Crutchfield. To the extent Crutchfield's opinions were introduced without affording Lamb his right to confrontation, the appellate court in

*Azcona* "acknowledge[d] that when a testifying expert offers an independently formed opinion, erroneously admitted evidence that a supervisor agrees with the opinion will often be harmless." (*Azcona, supra*, 58 Cal.App.5th at p. 515, citing *People v. Lopez* (2012) 55 Cal.4th 569, 585 [admission of nontestifying analyst's laboratory report linking the defendant's name to blood sample was harmless beyond a reasonable doubt in light of testifying analyst's independent opinion].) The Court of Appeal also found that the expert's independent opinion was "itself inadmissible insofar as it contained the unsupported conclusion that the bullet casings were certain to have been fired from the same gun. Taken together, that conclusion and the hearsay statements about supervisor approval gave the impression that the expert's opinion was entitled to more weight than it would otherwise deserve." (*Azcona*, at p. 515.) We do not have the same compounding error here. Because Edwards's testimony was based on his independent analysis and he, at most, relayed Crutchfield's similar conclusion without relying on it, any error in admitting Edwards's testimony was harmless.[13]

## D. The Prosecutor Did Not Commit Misconduct During Closing Argument

Lamb argues the prosecutor committed misconduct during guilt phase closing argument. Describing the prosecutor's strategy as "a number of one-two punches," Lamb asserts the prosecutor attacked defense counsels' integrity while

---

[13] Given our conclusion that any *Sanchez* error would be harmless, we need not address Lamb's further contention that the purported *Sanchez* error demonstrates that the refusal to sever the murder and attempted murder charges resulted in gross unfairness.

improperly vouching for the strength of the evidence. We disagree.

As a preliminary matter, Lamb never objected to the statements he now challenges and has thus forfeited this claim. "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion — and on the same ground — the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

The claim also lacks merit. "Under federal law, ' "Improper remarks by a prosecutor can ' "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." ' " ' [Citation.] Under state law, ' "a prosecutor who uses deceptive or reprehensible methods to persuade either the court or the jury has committed misconduct, even if such action does not render the trial fundamentally unfair." ' " (*People v. Huggins* (2006) 38 Cal.4th 175, 206 (*Huggins*).) "When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [Citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)

### 1. *Asserted Attacks on Defense Counsel's Integrity*

"The prosecution is given wide latitude during closing argument to make fair comment on the evidence, including reasonable inferences or deductions to be drawn from it." (*People v. Harris* (2005) 37 Cal.4th 310, 345.) " 'A prosecutor commits misconduct if he or she attacks the integrity of defense

counsel, or casts aspersions on defense counsel.' " (*People v. Pearson* (2013) 56 Cal.4th 393, 442 (*Pearson*).) " 'It is, of course, improper for the prosecutor "to imply that defense counsel has fabricated evidence or otherwise to portray defense counsel as the villain in the case . . . . Casting uncalled for aspersions on defense counsel directs attention to largely irrelevant matters and does not constitute comment on the evidence or argument as to inferences to be drawn therefrom." ' " (*People v. Redd* (2010) 48 Cal.4th 691, 749.)

Defense expert Dr. Smith testified regarding the effects of methamphetamine use and opined that the jail video of Lamb and Rump showed that Lamb was at the "agitation/rage" stage of methamphetamine impairment, while Rump was "more in rage, beginning of psychosis" phase. (See *ante*, pt. III.B.) Dr. Smith conceded that psychosis requires a clinical analysis that he did not conduct on Rump, nor did Dr. Smith consider his own 2007 examination of Lamb in rendering this opinion. Rather, Dr. Smith based his opinions about Lamb and Rump solely on the video.

During the prosecutor's closing argument, he said: "[W]hat [Dr. Smith] was trying to do is not fair and it is not right. Psychoses? Think about it." The prosecutor also asserted that Dr. Smith's opinion based solely upon video of Lamb and Rump was "absolute trash, and it has no place in a courtroom in a case like this." The prosecutor also said: "Don't let them fool you. When I say, 'them,' I'm talking about the defendants."

A prosecutor " 'is free to remind the jurors that a paid witness may accordingly be biased and is also allowed to argue, from the evidence, that a witness's testimony is unbelievable, unsound, or even a patent "lie." ' " (*Pearson, supra*, 56 Cal.4th

at p. 442.) That is what occurred here. Although the prosecutor's reference to Dr. Smith's opinion as "absolute trash" was intemperate, there is no reasonable likelihood that the jury would have understood the prosecutor to be asserting that defense counsel sought to deceive the jury. (*Ibid.*) Rather, the prosecutor argued in effect that Dr. Smith's opinion lacked sound foundation and should not be credited.

Lamb next asserts that when the prosecutor argued that defense counsel failed to deliver on assurances made in his opening statement, he insinuated defense counsel had attempted to fool the jury. The prosecutor argued: "[Defense counsel] stood in front of you in opening statement and said, 'I'm gonna prove to you beyond a reasonable double that the gun was not jammed.' And I remember thinking, 'man, you're gonna buy me a big drink because this gun was jammed.'" Lamb further faults the prosecutor for arguing that defense counsel used "red herring[s] . . . to get your focus away from your job" and for asking the jury to "[t]hink about what the defense want[s] you to buy." These statements were proper argument. (*People v. Harris* (1989) 47 Cal.3d 1047, 1085, fn. 19 ["It is totally proper to remind the jury in this way that the [defense's opening] statement was inaccurate in that some of those pieces are missing and that the verdict should rest only on evidence that has been admitted"]; *People v. Cunningham* (2001) 25 Cal.4th 926, 1002, 1003 [prosecutor's argument that defense counsel's "job is to create straw men" and "put up smoke, red herrings," was not misconduct and "would be understood by the jury as an admonition not to be misled by the defense interpretation of the evidence, rather than as a personal attack on defense counsel"].)

The prosecutor also argued that "[t]hey don't want 12 . . . because if they can fool one juror into taking his or her focus

away from the facts and the law, they win. That's not really fair because if you follow the law reasonably, objectively and fairly, the only conclusion is that they're guilty beyond any reasonable doubt." Even assuming there is a reasonable likelihood the jury would understand the prosecutor to be referring to defense counsel, he "simply used colorful language to permissibly criticize counsel's tactical approach," and did not improperly attack counsel's integrity. (*Huggins*, *supra*, 38 Cal.4th at p. 207.) The prosecutor simply "urg[ed] the jury not to be misled by defense evidence" and argument. (*Cummings*, *supra*, 4 Cal.4th at p. 1302.)

Lamb next objects to the prosecutor's response to Rump's argument that Lieutenant Epperson had refused to answer questions. On cross-examination, Rump asked Lieutenant Epperson whether a particular hypothetical scenario would be consistent with a crime committed for the benefit of a criminal street gang. Lieutenant Epperson responded that it was such an absurd set of hypothetical facts that he could not give a valid answer. During Rump's closing argument, he asserted that Lieutenant Epperson, Mason, and Johnson had all refused to answer questions, adding, "[m]ust be something contagious about gangs." On rebuttal, the prosecutor argued: "Doesn't . . . it kind of turn your stomach — it turned mine — when [Rump] gets up here and says [Lieutenant] Clay Epperson refused to answer questions just like Mason and just like Billy Joe Johnson. I mean, this is just pure imagination that has no basis in reality. He said . . . he refused to answer questions. You know what I think he's referring to is when [Lieutenant] Clay Epperson said, 'the hypo you're giving me is absurd. I can't answer your question because the hypo you're giving me is absurd.' And he calls that refused to answer question.

49

Remember his hypo is, you shoot at somebody, but you don't intend to kill them."

Lamb asserts the "prosecutor[ ] insiste[d] that the argument was nausea-inducing to him personally, and . . . suggest[ed] that the jurors should have the same reaction. . . ." We see no impropriety. "The prosecutor's comments responded directly . . . to earlier arguments made by defense counsel . . . . When the comments are considered in context, there is no [reasonable] likelihood that the jury would have understood the comments as anything beyond criticism of defense counsel's tactical approach in argument and the defense view of the evidence in the case, as is allowed. [Citations.] The comments did not constitute an improper argument or an attack on counsel's personal integrity." (*People v. Linton* (2013) 56 Cal.4th 1146, 1206; cf. *People v. Cole* (2004) 33 Cal.4th 1158, 1203 (*Cole*) [not reasonably likely that the jury understood the prosecutor's references to defense counsel as " 'deceiv[ing],' " " 'unfair,' " " 'misleading,' " or " 'tricky' " to be personal attacks on counsel's integrity where each of the statements was made in the context of rebutting a statement defense counsel had made during his closing argument].)

The prosecutor told the jury: "I know you're getting tired. I know it's been a long day already. Please bear with me. You'd want me to do my job, so please bear with me. Let me just — I'll tell you what I sometimes worry about. What I worry about sometimes is somebody sitting there going, '[prosecutor], I got it. I re[a]l[l]y got it. You really don't have to keep going. I got it.' I have to be able to go to sleep at night and I have to do my job. So bear with me. I'm not trying to insult anybody's intelligence. I know you got it, probably, but I need to talk about — I need to do my job. So please bear with me. I know it's hard. I know it

gets tedious. I know we've been sitting for a few hours. So please bear with me." Lamb focuses on one sentence in this portion of the prosecutor's argument, "I have to be able to go to sleep at night, and I have to do my job." He argues the prosecutor contrasted his approach with that of defense counsel and insinuated they "were conducting their job in an unfair manner and were trying to keep the jurors from doing their jobs."

Not so. "Although defendant singles out particular sentences to demonstrate misconduct, we must view the statements in the context of the argument as a whole." (*Cole*, *supra*, 33 Cal.4th at p. 1203.) The prosecutor did not mention defense counsel. Moreover, this statement was made during a discussion of jury instructions and the above-quoted language was preceded by the prosecutor turning to the conspiracy instruction ("Okay. All right. So now we start with count one, okay? That's CALJIC — excuse me, CALCRIM 563 is the instruction that defines a conspiracy — it's a long instruction. We're going to talk about it.") and a discussion of that instruction followed. As such, the complained-of statement was merely the prosecutor recognizing that it had been a long day and that the jury was getting tired and acknowledging the necessary but tedious task of applying the evidence to the instructions, but that he needed to do his job.

Finally, Lamb takes exception to the prosecutor's statement that Lamb and Rump "are not here on trial because they can serve as a billboard for Hitler. They're not here on trial because they're white supremacists. They're not here on trial because they're filled with hate. They're not here on trial because they glorify a symbol that stands for unimaginable atrocity, that swastika symbol. That's not why they're here on

trial. It's despicable, absolutely despicable, but that's not why they're here on trial. They're here on trial because they killed this human being, and they're here on trial because they tried to kill a peace officer."

Lamb claims that giving the jury this reminder was "paralipsis," a rhetorical device where a statement is made then denied for the purpose of emphasizing the statement. He claims this was improper in light of the prosecution's evidence that Lamb was a white supremacist, though he does not separately argue that the trial court erred in admitting such evidence. The prosecutor did not commit prejudicial misconduct by commenting on potentially inflammatory evidence in the record when urging the jury not to convict Lamb of any crime simply because he was a white supremacist. (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1379 [though a "prosecutor commits misconduct in making comments calculated to arouse passion or prejudice," such remarks will not be so construed unless a reasonable juror would have interpreted them as such]; *People v. Wrest* (1992) 3 Cal.4th 1088, 1106–1107 [prosecutor's use of paralipsis to highlight improper argument was not prejudicial].)

### 2. *Asserted Vouching*

Lamb claims that during closing argument, the prosecutor improperly vouched for the strength of his evidence based on his personal experience. We disagree.

" 'Improper vouching occurs when the prosecutor either (1) suggests that evidence not available to the jury supports the argument, or (2) invokes his or her personal prestige or depth of experience, or the prestige or reputation of the office, in support of the argument.' " (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480; see *People v. Frye* (1998) 18 Cal.4th 894, 971 (*Frye*) ["A

prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record"].) "The vice of such remarks is that they 'may be understood by jurors to permit them to avoid independently assessing witness credibility and to rely on the government's view of the evidence.' [Citation.] However, these limits do not preclude all comment regarding a witness's credibility. ' " ' [A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.' " ' " (*People v. Bonilla* (2007) 41 Cal.4th 313, 336–337.) "[S]o long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' [their] comments cannot be characterized as improper vouching." (*Frye*, at p. 971.)

Lamb's complaints concerning the prosecutor's recurring argument that the case was "not even close" and his repeated use of the phrases, "[i]t gets better," "I love this one," "[g]ive me a break," and "[y]ou got to be kidding me" while arguing the evidence are completely without merit. These instances were comments on the trial evidence and there is no reasonable likelihood the jury would understand the prosecutor to be relying on evidence outside the record. "Counsel may vigorously argue his case and is not limited to 'Chesterfieldian politeness' " (*People v. Bandhauer* (1967) 66 Cal.2d 524, 529), and there is nothing to suggest these arguments constituted the prosecutor injecting his personal beliefs based on facts not in evidence

rather than merely commenting on the evidence adduced at trial.

On rebuttal, the prosecutor referred to Johnson's assertion that he gave the murder weapon to Lamb and argued: "I've been doing this for awhile, and . . . Johnson is not the first murderer I cross-examined. He's not gonna be the last. I'm telling you this because it's rare when the People's case gets better after the defense put their witnesses on, but that happened here. I was sitting going, 'this is great.' The People's case by the time I rested was great, proof beyond a reasonable doubt. By the time they finished putting their evidence on, I'm going, 'man, it just got better.' It just kept getting better and better and better. It has nothing to do with me. It has nothing to do with me. I'm not saying I'm a good lawyer, no. It's the truth."

The propriety of the prosecutor's reference to his own experience is a close question. "[P]rosecutors should not purport to rely on their outside experience or personal beliefs based on facts not in evidence when they argue to the jury." (*People v. Medina* (1995) 11 Cal.4th 694, 758; see *ibid.* [prosecutor's statement that " 'no case I have ever seen' " had such overwhelming evidence was " 'objectionable' "].) The prosecutor's comments that "I've been doing this for awhile" and that it is rare for the People's case to get better after the defense presents their witnesses arguably references extra-record evidence, namely, the prosecutor's experience in trying other cases.

However, we have found statements ostensibly referencing a prosecutor's experience to be proper commentary on the evidence. (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1057–1058 (*Stansbury*) [prosecutor's statement " 'that's the best

case I've ever seen in any case I've ever prosecuted of intentional misrepresentation and consciousness of guilt' " was not inappropriate]; *People v. Rich* (1988) 45 Cal.3d 1036, 1092 [" 'I have never seen deliberation and premeditation like that' " held to be nothing more than fair comment on the evidence and vigorous argument].)  Here, these statements were made in the context of arguing the implausibility and ineffectiveness of Johnson's testimony that he gave Lamb the murder weapon, and thus was commentary on evidence produced at trial.

While we do not condone a prosecutor referencing their experience in comparing a case to other matters not in evidence, on balance, we conclude that there is no reasonable likelihood the jury would have understood the prosecutor's statement here to be based on evidence outside the record.  (*Frye*, *supra*, 18 Cal.4th at p. 1018; see *Stansbury*, *supra*, 4 Cal.4th at p. 1058 ["It must have been evident to the jury that it was the evidence produced at trial, not the prosecutor's experience, that demonstrated defendant's mendacity and consciousness of guilt"].)  The reference to the prosecutor's experience was brief, and it is unlikely the jury would have viewed the comment as an invitation to determine the trustworthiness of Johnson's testimony based upon the prosecutor's experience in other criminal trials, as opposed to the testimony itself.  Additionally, the jury was instructed that the attorneys' arguments are not evidence, and we presume the jury was able to understand and follow the instructions.  (*People v. Morales* (2001) 25 Cal.4th 34, 47; *People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

### E.  The Conspiracy to Commit Murder Conviction Was Supported by Substantial Evidence

Lamb asserts that the trial court erred in denying his motion for entry of judgment of acquittal for the charge of

conspiracy to commit murder (§ 1118.1) and argues that no substantial evidence supports his conviction for that crime.[14] We disagree.

" 'The standard applied by a trial court in ruling upon a motion for judgment of acquittal pursuant to section 1118.1 is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction, that is, "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged." ' [Citation.] 'The purpose of a motion under section 1118.1 is to weed out as soon as possible those few instances in which the prosecution fails to make even a prima facie case.' [Citations.] The question 'is simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination.' [Citation.] The sufficiency of the evidence is tested at the point the motion is made. [Citations.] The question is one of law, subject to independent review." (*People v. Stevens* (2007) 41 Cal.4th 182, 200.)

We conclude that there was substantial evidence of conspiracy to commit murder at the time the court denied the section 1118.1 motion, and the record supports Lamb's

---

[14]    Section 1118.1 provides in relevant part: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

subsequent conviction for this crime. " ' " 'Conspiracy requires two or more persons agreeing to commit a crime, along with the commission of an overt act, by at least one of these parties, in furtherance of the conspiracy.' " ' [Citation.] ' " 'Evidence is sufficient to prove a conspiracy to commit a crime 'if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime.' " ' [Citation.] 'Evidence of an agreement does not require proof that the parties met and expressly agreed; a criminal conspiracy can be shown through circumstantial evidence. . . .' [Citation.] ' " 'The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.' " ' " (*People v. Navarro* (2021) 12 Cal.5th 285, 302–303 (*Navarro*).) " '[A]ll conspiracy to commit murder is necessarily conspiracy to commit premeditated and deliberated first degree murder.' " (*People v. Maciel* (2013) 57 Cal.4th 482, 515 (*Maciel*).)

Here, there was substantial circumstantial evidence of a conspiracy to murder. (See *People v. Homick* (2012) 55 Cal.4th 816, 870 [the element of agreeing to commit a crime "must often be proved circumstantially"].) That Lamb and Rump committed the murder together is probative of an agreement to have done so. Although two people committing a crime together does not alone prove a conspiracy, it is probative of a conspiracy when there is indicia of organization and forethought. (See *People v. Cockrell* (1965) 63 Cal.2d 659, 667 ["The agreement may be inferred from the conduct of the defendants in mutually carrying out a common purpose in violation of a penal statute"].) Under analogous precedent, the jury could reasonably infer that Lamb and Rump entered the conspiracy to kill Miller at some point after the Fox videos aired. (See *Maciel*, *supra*, 57 Cal.4th at

p. 516; *People v. Jurado* (2006) 38 Cal.4th 72, 121 (*Jurado*) ["Although there is no direct evidence that defendant and [an accomplice] discussed in advance the killing of [the victim], there was evidence that they were alone together . . . shortly before the killing, during which a discussion and agreement could have taken place"].)

Moreover, the circumstances of the killing further evidence an agreement. On the day of the murder Lamb called to speak to Hinson about something important. Lamb, Rump, and Hinson were seen together later that night at Harris's apartment adjacent to where Miller was killed, and Miller was killed moments after Lamb and Rump left the apartment. These circumstances evidence planning activity and support an inference that Lamb and Rump came to a mutual understanding to murder Miller. Evidence that Lamb and Rump fled when confronted by police also demonstrates a consciousness of guilt.

Miller was killed by a single gunshot wound to the back of his head, a manner of killing that suggests planning and an intent to kill. Miller had no defensive wounds, and a Pepsi can and baseball hat were found underneath his body, indicating a surprise attack. There was no evidence that Miller frequented the area where he was killed. From this, the jury could reasonably infer he was taken by agreement to the area where Lamb and Rump were waiting to kill him.

Lamb, Rump, Johnson, Hinson, and the victim Miller were all associated with PEN1. Their relationship provided insight into their common understandings and motivations, and ultimately the bases for an agreement. Mason's and Lieutenant Epperson's testimony provided evidence that it would have been known within the gang that Miller's participation in the Fox

videos would be met with severe consequences. Lieutenant Epperson also testified that members of white supremacist gangs would be expected to be aware of the crimes committed by other members and would understand that committing a violent crime would increase their status within the gang. Miller's status within PEN1 was already diminished prior to the videos and he had become personally disliked within the gang. Mason testified that Lamb did not have a high status in PEN1 prior to committing the murder and expected "stripes" for having done so. Additionally, it would be expected for a gang member to have another gang member alongside as backup when committing a violent crime. Furthermore, that Lamb and Rump had a close relationship was evident, as jail correspondence between the pair revealed expressions of love and loyalty and that they referred to each other as their left and right "butt cheek."

Along with evidence of Lamb and Rump's conduct, the "relationship, interests, and activities of the alleged conspirators" here provides circumstantial evidence from which a conspiracy may be inferred. (*Navarro, supra,* 12 Cal.5th at p. 303.) Contrary to Lamb's assertion, the absence of evidence that Mazza ordered Miller to be killed does not render insubstantial this other evidence supporting the conspiracy to commit murder conviction.

We conclude this evidence collectively supports an inference that the parties, including Lamb, " 'positively or tacitly came to a mutual understanding' " to murder Miller. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135.) "As the object of the conspiracy was to kill [the victim], his murder satisfied the element of an overt act committed in furtherance of the conspiracy." (*Maciel, supra,* 57 Cal.4th at p. 518, see also *Jurado, supra,* 38 Cal.4th at p. 121 ["Commission of the target

offense in furtherance of the conspiracy satisfies the overt act requirement"].)

### F. Assembly Bill No. 333 Requires the Reversal of the Gang Convictions, Enhancements, and Special Circumstance

Lamb contends that the changes to section 186.22 occasioned by the enactment of Assembly Bill No. 333 require reversal of the gang convictions, and the jury's true findings on the gang enhancements and the gang-murder special-circumstance allegation. (See *People v. Rojas* (2023) 15 Cal.5th 561, 566, 580 [Assembly Bill No. 333's definition of "criminal street gang" applies to the gang-murder special circumstance].) Specifically, Lamb argues that although the prosecution introduced certified records of five predicate offenses to prove the element of the gang's pattern of criminal activity,[15] there was no evidence introduced at trial that the predicate offenses "commonly benefited a criminal street gang, and the common benefit from the offenses [was] more than reputational," as required under the amended statute. (§ 186.22, subd. (e)(1), as amended by Stats. 2021, ch. 699, § 4.)

We conclude that although there was an abundance of gang evidence presented to the jury, and each predicate offense had a gang enhancement under a prior version of section 186.22, the record does not sufficiently disclose the circumstances surrounding the predicate offenses or how any specific predicate offense actually benefited the gang. Thus, a rational juror could

---

[15] "The offenses comprising a pattern of criminal gang activity are referred to as predicate offenses." (*People v. Valencia* (2021) 11 Cal.5th 818, 829 (*Valencia*).)

have reasonably concluded that any common benefit was not more than reputational.

## 1. *Background*

### a. *Evidence of predicate offenses*

The prosecution's gang expert, Lieutenant Epperson, discussed 14 offenses committed by various PEN1 members. However, the prosecution admitted into evidence certified records of only five of those offenses. In accordance with our rulings in *Sanchez, supra*, 63 Cal.4th at page 686 [an expert cannot relate as true case-specific facts asserted in hearsay statements unless they are independently proven by competent evidence or are covered by a hearsay exception] and *Valencia, supra*, 11 Cal.5th at page 839 [facts concerning particular events and participants alleged to have been involved in predicate offense constitute case-specific facts that must be proved by independently admissible evidence], the Attorney General only discusses the predicate offenses established by such evidence. Assuming, without deciding, that these records constitute independently admissible evidence, we also only consider these five predicate offenses here.

### i. *Brody Davis*

In 1999, Brody Davis pled guilty and admitted that on July 14, 1998, he knowingly, willfully, and unlawfully prevented or dissuaded "a victim and witness to a crime" from giving testimony at a preliminary hearing. (See § 136.1, subd. (a)(1).) As the factual basis for the plea, Davis admitted that on that date he "knowingly and actively participated in a criminal street gang called [PEN1]," he "willfully promoted, aided and abetted and furthered the interest of that gang and its members by committing" the offense, and he committed the offense "for the

benefit of, at the direction of, or in association with the [PEN1] criminal street gang with the specific intent to promote, further, or assist in any criminal conduct by [PEN1] gang members." (See § 186.22, subd. (b)(1).) Davis also pled guilty to street terrorism. (§ 186.22, subd. (a).)

### ii. *Daniel Lansdale*

In 2001, Daniel Lansdale pled guilty to 12 separate counts involving theft and forgery. The factual basis for the plea provided, in pertinent part: "On or about November 15, 2001 . . . I willfully and unlawfully entered . . . two different department stores located at the Brea Mall, with the intent to commit larceny and any felony as charged in counts 1 & 2 of Amended #1 complaint. I committed the crime of burglary as charged in count 1 of the Amended #1 complaint for the benefit of, at the direction of, and in association with a criminal street gang, to wit, [PEN1], while I was an active member of that gang and I did so with the specific intent to promote, further and assist in criminal conduct by [PEN1] gang members."

### iii. *Brian Arthur O'Leary*

In 2000, a jury found Brian Arthur O'Leary guilty of attempted murder (§§ 187, subd. (a), 664) and street terrorism (§ 186.22, subd. (a)), with an enhancement that the attempted murder was committed for the benefit of PEN1 (§ 186.22, subd. (b)(1)).

### iv. *Donald Mazza and Nick Rizzo*

In 1999, Mazza, Rizzo, and Albert Sherwin were charged with conspiracy to murder (§§ 182, subd. (a)(1), 187, subd. (a)) and the attempted murder of W.A. (§§ 187, subd. (a), 664), with attendant gang enhancements (§ 186.22, subd. (b)(1)). According to the overt acts alleged in the amended information,

which was included as part of the certified records of the predicate offenses admitted into evidence, Mazza, Rizzo, and Sherwin went to an address to look for W.A., Mazza repeatedly stabbed W.A. and "said to witnesses present 'want some too punk' to intimidate and frighten witnesses," Rizzo punched W.A., Sherwin stood by as backup, and the three fled the scene together.

In 2003, Mazza pled guilty to attempted murder with a gang enhancement and street terrorism. The factual basis for the plea was as follows: "On April 6, 1999, in Orange County, I, with others aiding and abetting me, stabbed [W.A.] multiple times, intending to kill him without excuse or justification. I did this for the benefit of and in association with a criminal street gang, [PEN1], within the meaning of Penal Code sections 186.22(a)[,] (b)(1), knowing that [PEN1] has engaged in a pattern of criminal activity and while an active member of [PEN1]."

In 2003, a jury found Rizzo guilty of conspiracy to commit murder, attempted murder, and street terrorism. According to the minute order of the verdict admitted into evidence, as to the conspiracy and attempted murder convictions, the jury found it true "that the defendant crime committed for the benefit of criminal street gang within the meaning of [section] 186.22(b)(1)." (*Sic.*)

b. *Instructions provided to Lamb's jury*

The instructions on the street terrorism charges here provided that a criminal street gang, among other criteria, is any ongoing organization, association, or group of three or more persons, whether formal or informal, "[w]hose members, whether acting alone or together, engage in or have engaged in

a pattern of criminal gang activity." The jury was instructed that a "pattern of criminal activity" means: "1. The commission of, or attempted commission of, or conspiracy to commit, or solicitation to commit, or conviction of, or having a juvenile petition sustained for commission of any combination of two or more of the crimes listed in Instruction 1400A,[16] or two or more occurrences of one or more of the crimes listed in Instruction 1400A; 2. At least one of those crimes was committed after September 26, 1988; AND 3. The crimes were committed on separate occasions or were personally committed by two or more persons on the same occasion." The jury was further instructed that "[t]he crimes, if any, that establish a pattern of criminal gang activity, need not be gang-related."[17]

---

[16] Instruction 1400A instructed the jury: "The following is a list of the applicable crimes contained in Penal Code Section 186.22(e): 1. Murder, Attempted Murder or Conspiracy to Commit Murder. 2. Manslaughter or Attempted Manslaughter[.] 3. Assault with a deadly weapon or by means of force likely to produce great bodily injury. 4. Robbery. 5. The sale, possession for sale, transportation, manufacture, offer for sale, or offer to manufacture controlled substances. 6. Dissuading, intimidating or attempting to dissuade or intimidate witnesses or victims. 7. Burglary. 8. Criminal or Terrorist Threats. 9. Theft and unlawful taking or driving of a vehicle, in violation of Section 10851 of the Vehicle Code."

[17] This instruction also provided: "If you find a defendant guilty of a crime in this case, you may consider that crime in deciding whether one of the group's primary activities was commission of that crime and whether a pattern of criminal gang activity has been proved." However, as amended by Assembly Bill No. 333, section 186.22, subdivision (e)(2) now provides, "[t]he currently charged offense shall not be used to establish the pattern of criminal gang activity." (Stats. 2021, ch. 699, § 4.)

As to the gang enhancements, the jury was instructed that the prosecution had to prove that Lamb "committed or attempted to commit the crime for the benefit of, at the direction of, or in association with a criminal street gang" and with the "specific intent to assist, further, or promote in any criminal conduct by gang members." The instructions on the gang enhancements, carrying a firearm by an active gang member, and the gang-murder special circumstance all incorporated by reference the definition of "criminal street gang" provided in the street terrorism instruction.

### 2. *Discussion*

#### a. *Changes to the definition of a criminal street gang*

Effective January 1, 2022, Assembly Bill No. 333 amended section 186.22's definition of a "criminal street gang." (Stats. 2021, ch. 699, § 3.) In order to demonstrate the "pattern of criminal gang activity" element of a " 'criminal street gang,' " (§ 186.22, subd. (f)) the statute now requires, among other things, proof of at least two enumerated predicate offenses "committed on separate occasions or by two or more members" which "commonly benefited a criminal street gang," and that the common benefit be "more than reputational." (§ 186.22, subd. (e)(1), as amended by Stats. 2021, ch. 699, § 4.) The revised statute also provides, "[e]xamples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g), as amended by Stats. 2021, ch. 699, § 4.)

Lamb observes that his jury was not required to find that the predicate crimes used to establish the pattern of criminal activity "commonly benefited" a criminal street gang in a way "more than reputational."  (§ 186.22, subd. (e)(1).)  Lamb also notes that absent from the gang enhancement instructions were the updated requirements of section 186.22, subdivision (g), that to "benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational." (Stats. 2021, ch. 699, § 4.)

The parties agree that Lamb's jury was instructed under the prior law and that the new requirements apply retroactively to his case on appeal.  (*In re Estrada* (1965) 63 Cal.2d 740; *People v. Cooper* (2023) 14 Cal.5th 735, 738–739 (*Cooper*); *Tran, supra,* 13 Cal.5th at pp. 1206–1207.)

#### b.  *Harmless error standard*

The parties agree that the prejudice from an instruction that omits an element of an offense is assessed under *Chapman*. (*Neder v. United States* (1999) 527 U.S. 1, 4 (*Neder*); see *Tran, supra,* 13 Cal.5th at p. 1207 ["When a substantive change occurs in the elements of an offense and the jury is not instructed as to the proper elements, the omission implicates the defendant's right to a jury trial under the Sixth Amendment, and reversal is required unless 'it appears beyond a reasonable doubt' that the jury verdict would have been the same in the absence of the error"].)

In this assessment, we "conduct a thorough examination of the record.  If, at the end of that examination, [we] cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error — for example, where the defendant contested the omitted element and raised evidence

sufficient to support a contrary finding — [we] should not find the error harmless." (*Neder*, *supra,* 527 U.S. at p. 19.) Conversely, where we conclude "beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." (*Id.* at p. 17.)

"In assessing prejudice in this context, the question is not whether there is evidence in the record that would support a jury finding of the missing element. Instead, we ask whether we can conclude beyond a reasonable doubt that 'the jury verdict would have been the same' had the jury been instructed on the missing element." (*People v. Brown* (2023) 14 Cal.5th 453, 474, quoting *Neder*, *supra*, 527 U.S. at p. 17.) "Our task, then, is to determine 'whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element.'" (*People v. Mil* (2012) 53 Cal.4th 400, 417 (*Mil*), quoting *Neder*, at p. 19.)

### c. People v. Cooper

Both parties rely on our recent decision in *Cooper*. There, the defendant was a member of a gang, and the records of conviction and gang expert testimony establishing the predicate offenses showed that two fellow gang members committed one crime each — robbery (§ 211) and a narcotics sale (Health & Saf. Code, § 11351.5). (*Cooper*, *supra*, 14 Cal.5th at pp. 739–741.) The gang expert also testified that the gang's primary activities were, among other offenses, robbery and narcotics sales, but did not testify as to how the alleged predicate offenses benefited the gang. (*Id.* at p. 741.) We concluded that, as now required by Assembly Bill No. 333, "the failure to instruct that the alleged

predicate offenses must have 'commonly benefited' the gang in a 'more than reputational' manner (§ 186.22, subd. (e)(1)) was not harmless beyond a reasonable doubt." (*Cooper*, at p. 739.)

In doing so, we observed that, "[i]n sum, the grand total of evidence relied on by the Attorney General for proving that the alleged predicate offenses provided a common benefit that is more than reputational to the gang is that there was a robbery and a sale of narcotics by gang members and that a primary activity of the gang is to commit robberies and the sale of narcotics." (*Cooper*, *supra*, 14 Cal.5th at p. 746.) We noted that "the record does not disclose the circumstances surrounding the predicate offenses and the prosecution never introduced any evidence about how the gang commonly benefited from them. While robbery and the sale of narcotics typically provide a financial benefit to the *offender*, the record contains evidence that could rationally lead to a contrary finding regarding whether the fruits of the offenses were intended to or did benefit the *gang as a whole*." (*Id*. at p. 743.) Based upon this record, we held that "a jury could have reasonably concluded that the predicate offenses at issue were committed for personal gain alone." (*Id*. at p. 744.)

d. *Analysis*

Lamb argues there was no evidence — either documentary or testimonial — that the offenses actually benefited the gang and that the common benefit was more than reputational. Lamb observes that "[w]hile burglary and dissuading a witness could theoretically have been committed to benefit the gang, there was no evidence in support of that theory," and that "[t]here was no testimony as to how the offenses provided an actual and common

benefit to the gang beyond enhancing the reputation and status of individual members." We agree.

As to evidence concerning how committing crimes benefited the gang, Lieutenant Epperson testified to his general belief that any crime committed by a gang member benefits the gang. Lieutenant Epperson explained that "criming into a gang" was a way for a person to join a white supremacist gang by "do[ing] crimes that would benefit the gang in some capacity, and if you did enough work in terms of the crime, that you could be admitted to the gang based on that alone." However, Lieutenant Epperson did not expound upon what crimes would benefit the gang, or how. To gain respect in the gang, Lieutenant Epperson testified that a person could demonstrate that they are "willing to wade in and fight other people for the benefit of the gang," though he did not explain how that could benefit the gang. Lieutenant Epperson also provided his ultimate opinion that the murder and attempted murder committed here would have been for the benefit of the gang, but again did not explicate how. Lieutenant Epperson explained that while PEN1 espoused a white racist ideology, it did not motivate their day-to-day activities, and that "if you look at what they actually do, they are self-serving mercenary criminals."[18]

---

[18]    That is, they did not "go out looking to commit crimes against minorities" or "burn synagogues" or "burn crosses on people's lawns." Rather than committing hate crimes, PEN1 "would be much more inclined to target people within their own milieu, peer group . . . weaker Whites in their group. . . . to a greater extent, the community at large, they're victimizing them by selling drugs, stealing property, engaging in identity theft."

Lieutenant Epperson provided some more specific explanations as to how various crimes benefited the gang, though they are also lacking. When asked by defense counsel whether a gang member on drugs stealing a sandwich benefits the gang, Lieutenant Epperson testified that it did because "he can feed himself without having to spend his own money or to sell any dope to buy that food." In explaining the "concept of backup within a gang," Lieutenant Epperson stated that if a fellow member were attacked or needed assistance with some type of criminal enterprise, such as collecting on a debt, a member would be expected to "back up the other players in the gang. That is the benefit of the gang." Lieutenant Epperson also testified that victim and witness intimidation "is a feature of the gang that is directly related to their use of violence. That through the use of egregious violence, you hope to intimidate other gang members, associates, and the general public that they would be intimidated not to either inform on you to the police or testify against you in court, and that they can stop a lot of prosecutions against them by intimidating the witnesses."

---

Lieutenant Epperson also explained how PEN1 was not a turf-oriented gang or one which attached its identity to a particular neighborhood and protected it from outside intervention. Rather, white supremacist gangs tend not to associate with a specific area but instead "tend to see themselves in terms of being . . . an ideological movement." Lieutenant Epperson also stated that "white racist gang members, while they use violence as a tool of their enterprise, they don't use violence in the same way that traditional gangs, Black and Hispanic gangs, which tend to do a lot of, say, drive-bys, walk-bys, walk up shoot other gang members in turf confrontations. They use firearms as an intimidation factor and as a tool to achieve a violent end when they need it."

Even if a jury were to parse this testimony and deduce exactly how PEN1 commonly benefited from crimes committed by its members, the lack of evidence of the circumstances surrounding the predicate offenses at issue does not establish that they fit into any of those scenarios so as to preclude a jury from reasonably concluding that any common benefit was not more than reputational. Here, other than general testimony concerning how gang members could benefit the gang through criminal acts, there was no other evidence "about how the specific predicate offense actually benefited the gang. (See *People v. E.H.* (2022) 75 Cal.App.5th 467 (*E.H.*) [finding that though the predicate offenses included crimes that could, in theory, provide a monetary benefit to the gang, the evidence did not show that these predicate offenses *actually* benefited the gang].)" (*Cooper*, *supra*, 14 Cal.5th at pp. 743–744.) There is no evidence as to how Davis's dissuasion of a witness, Lansdale's financial crimes, and O'Leary's, Mazza's, and Rizzo's attempted murder convictions actually provided a common benefit that was more than reputational.[19]

---

[19] It should be noted that the Fox videos did provide some information on the circumstances of these crimes. The second video describes the April 1999 attempted murder committed by Mazza and Rizzo: "Detectives say within five hours of his release [Mazza] was back in Orange County, seated inside a camper smoking methamphetamine with two accomplices and hit the victim, a gang dropout, [W.A.]. According to this felony complaint, Dominic Rizzo, another PEN1 parolee, beat and held [W.A.] as [Mazza] plunged a knife into him over and over again. Then [Mazza] turned to witnesses and asked, 'Want some too punk?'" The second video also displayed O'Leary's image and stated that he along with another "young skinhead" attacked an ex-white supremacist, and an officer states, "[o]ne guy took a

The Attorney General states that Assembly Bill No. 333 "did not alter or otherwise amend the ordinary rules of evidence, including the principle that reasonable inferences may be drawn from the evidence," and argues that the revised statute does not disallow "reasonable inferences based on the facts of a particular case — including inferences from the evidence about a gang's primary activities — that might inform whether a predicate offense involved a common benefit that was more than reputational." In *Cooper*, we rejected a similar characterization of our standard of review, and again do so here. (*Cooper*, *supra*, 14 Cal.5th at p. 743, fn. 7 ["The Attorney General incorrectly characterizes the *Chapman* inquiry before us as asking whether the jury could draw a reasonable inference that the alleged predicate offenses commonly benefited the gang. This, however, is not the proper standard"]; see also *id*. at p. 743 [a jury's determination that an offense is within the gang's primary activities merely constitutes a conclusion about the types of activities in which a gang typically engages, which is distinct from the question of whether a particular offense has commonly benefited the gang, which "asks about how the specific predicate offense actually benefited the gang"].) Though it may be "permissible, as a general matter, to use circumstantial evidence to prove a common benefit that is more than reputational" (*id*. at p. 745, fn. 9), our inquiry here is not whether a jury *could* have found a more-than-reputational

---

knife, stabbed him twice, another guy took a baseball bat and hit him upside the head." However, the jury was instructed that it "may not consider the recording as proof of the truth of any statements made by anyone during the recording." Accordingly, the jury could not supplement the evidence concerning the predicate offenses with the circumstances detailed in the videos.

common benefit.  (See *Mil*, *supra*, 53 Cal.4th at p. 418 [unlike sufficiency of the evidence claims, where we view the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of any facts the jury might reasonably infer from the evidence, "our task in analyzing the prejudice from the instructional error is whether any rational fact finder could have come to the *opposite* conclusion"].)

To be sure, unlike *Cooper* and other cases that have examined this issue following the enactment of Assembly Bill No. 333, there was no direct evidence presented at Lamb's trial indicating PEN1 members committed crimes merely to enhance the gang's reputation at large.  (Cf. *Cooper*, *supra*, 14 Cal.5th at p. 741 [gang expert testified:  " 'They're out there going on missions, they're doing shootings, they're doing robberies, they function to do gang banging things.  And that gets that gang's name out there"]; *People v. E.H.*, *supra*, 75 Cal.App.5th at p. 473 (*E.H.*) [officer "explained that when members of the gang commit violent crimes, like robbery, they benefit the gang by bolstering its reputation within the community for violence"]; *People v. Sek* (2022) 74 Cal.App.5th 657, 669 ["Although there was a great deal of evidence of benefits to the gang that went beyond reputational," Court of Appeal could not "rule out the possibility that the jury relied on reputational benefit to the gang as its basis for finding the enhancements true" where gang expert testified that the type of crime committed " 'enhances not only the individual gang members . . . but enhances the status and their reputation of the . . . gang as a whole' "].)  But here, as in *Cooper*, "the prosecution made no attempt to prove that the alleged predicate offenses provided a more than reputational common benefit to the gang and [defendant] made no such concession." (*Cooper*, at p. 743.)  Although the Attorney General

repeatedly argues that the jury could infer an extra-reputational benefit, he does not argue that the jury would have been unable to infer the opposite.

Moreover, Lieutenant Epperson repeatedly testified as to how an individual gang member could increase their status and respect *within the gang*. Lieutenant Epperson explained that a gang member "could earn respect in a gang . . . through the use of violence, successful criminal enterprise, just being a very hard individual. You don't tell on your peers. You're willing to wade in and fight other people for the benefit of the gang. That's . . . how you would earn respect. The measure of a man within a white racist gang is his willingness to use violence, and the more egregious violence the better." Lieutenant Epperson testified that a PEN1 member who killed a police officer would see a huge increase in their status. A gang member could also increase their status by providing backup to another member. Additionally, Lieutenant Epperson testified that possessing a firearm, committing a crime with a gun, being in Pelican Bay State Prison, or being falsely accused of a crime but taking "the heat for it" would all increase a member's status within the gang.

Based upon this evidence, a juror could have concluded that the predicate offenses were committed to bolster the offender's reputation within the gang, or if committed alongside other gang members, that the offense provided the common benefit of increased status to each perpetrator. As such, the record contains evidence that could rationally lead to a contrary finding as to whether the common benefit from an offense was more than reputational.

Although a rational juror may well infer that at least two of the predicate offenses were committed for a common benefit that was more than reputational, there is a lack of evidence as to how the specific predicate offenses at issue actually commonly benefited the gang to preclude the opposite conclusion. While Davis's dissuading a witness offense and Lansdale's financial crimes could in theory have offered a common benefit that was more than reputational under amended subdivision (g) of section 186.22, the record here does not establish that benefit.[20] The record does not disclose, for example, any details of Davis's offense, such as information about the witness dissuaded or whether the preliminary hearing even concerned PEN1, so as to demonstrate a more-than-reputational benefit. Nor does the record of Lansdale's convictions for financial crimes prove that *the gang* benefited financially or otherwise in a manner that was more than reputational. Similarly, the records of O'Leary's, Mazza's, or Rizzo's attempted murder convictions contain no information about the victim that would demonstrate the crimes were committed for "retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant" (§ 186.22, subd. (g)), or that would otherwise preclude a rational juror from inferring that the common benefit to the gang was merely reputational. Nor does the fact that some of the predicate offenses were committed by high-ranking members change our conclusion, as their status does not supplement the scant evidence of the circumstances of the offenses to provide evidence of a more-than-reputational

---

[20] Even if the record of Davis's and Lansdale's offenses were more robust so as to meet the harmlessness standard, we note that these offenses did not occur within three years of each other as required by section 186.22, subdivision (e)(1).

common benefit here. (Cf. *Cooper*, *supra*, 14 Cal.5th at p. 745 ["assuming arguendo that senior or well-known gang membership could possibly be evidence that predicate offenses commonly benefited the gang"].)

Rather, as in *Cooper*, the record "does not disclose the circumstances surrounding the predicate offenses and the prosecution never introduced any evidence about how the gang commonly benefited from them." (*Cooper*, *supra*, 14 Cal.5th at p. 743.) Without more evidence of how these specific predicate offenses commonly benefited the gang in a more than reputational manner and given that the record contains evidence that PEN1 members committed offenses to increase their own reputation within the gang, we conclude that a rational juror could have found that the predicate offenses did not provide a common benefit that was more than reputational.

The instructional error is compounded by other changes in the law that would affect the jury's determination. The jury was able to rely on case-specific hearsay concerning numerous other predicate offenses that were not independently proven by competent evidence, which is no longer permitted. (*Sanchez*, *supra*, 63 Cal.4th at p. 686; *Valencia*, *supra*, 11 Cal.5th at pp. 838–839.) The jury was instructed that the predicate offenses need not be gang related, which directly contradicts Assembly Bill No. 333's new requirements. (*Cooper*, *supra*, 14 Cal.5th at p. 744.) The jurors were also "permitted to consider the current offenses in determining whether the prosecution had proven a pattern of criminal gang activity . . . ." (*E.H.*, *supra*, 75 Cal.App.5th at p. 479.) This makes it more difficult to conclude "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman*, *supra*, 386 U.S. at p. 24.)

To be sure, there was substantial evidence that PEN1 was a gang, or at least the parties assumed that to be the case under the prior version of section 186.22. Indeed, the jury was presented with an abundance of evidence of PEN1's criminal activities from which it could rationally infer that the predicate offenses were committed for a common benefit that was beyond reputational. Were this a question of sufficiency of the evidence, the outcome might be different. But determining whether the evidence was sufficient to conclude that there was a common benefit that was more than reputational is not our task. (*Mil*, *supra*, 53 Cal.4th at p. 418.)

Despite the ample gang evidence here and the inferences that could have been drawn therefrom, we conclude the absence of evidence concerning the circumstances of the predicate offenses and the actual common benefit to the gang suggests a rational juror could have found the omitted requirements to be unsupported. Accordingly, Lamb's gang convictions, and the jury's true findings on the enhancements and the special circumstance allegation must be reversed. Because this was the only special circumstance found true by the jury, Lamb's judgment of death is vacated.

## G. Lamb's Claim of Cumulative Prejudice Is Without Merit

Lamb contends that, even if independently harmless, the cumulative prejudicial impact of the alleged guilt phase errors discussed here "rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.)

Aside from the instructional error and prejudice occasioned by the passage of Assembly Bill No. 333 (*ante.*, pt. III.F.), we assumed but found harmless error in the admission

of the Fox videos (*ante.*, pt. III.A.), Rump's jailhouse statement (*ante.*, pt. III.B.), and the conclusions of the nontestifying firearms examiner (*ante.*, pt. III.C.). Although Lamb's meritorious Assembly Bill No. 333 claim results in the reversal of the gang charges, enhancements, and special circumstance, the assumed erroneous admission of this other evidence does not compound to warrant reversal of any other charges or enhancements.

## IV. PENALTY PHASE RETRIAL

Lamb raises several claims of error relating to the penalty phase retrial and to the validity of his death sentence. However, we need not reach these claims given our conclusion that the changes to section 186.22 made by Assembly Bill No. 333 result, inter alia, in the reversal of the sole special circumstance alleged and found true by the jury. Therefore, the death judgment must be vacated, and Lamb's penalty phase claims are moot. For the same reasons, we need not address Lamb's claim of cumulative penalty phase error, or the Attorney General's claims of an unauthorized sentence and an error on the sentencing minute order.

## V. DISPOSITION

For the foregoing reasons, we reverse Lamb's convictions for street terrorism and unlawfully carrying a loaded firearm in public by an active participant in a criminal street gang, as well as the true findings on the gang enhancements and gang-murder special circumstance. In so doing, we vacate Lamb's death judgment and remand the case to the trial court for any

retrial of the reversed convictions, enhancements, and special circumstance.  (*Cooper*, *supra*, 14 Cal.5th at pp. 746–747.)  In all other respects, the judgment is affirmed.

**EVANS, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Lamb

_____

**Procedural Posture** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**


_____

**Opinion No.** S166168
**Date Filed:** July 11, 2024

_____

**Court:**  Superior
**County:**  Orange
**Judge:**  William R. Froeberg

_____

**Counsel:**

Kathy R. Moreno, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Rob Bonta, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Julie L. Garland and James W. Bilderback II, Assistant Attorneys General, Holly D. Wilkens, Ronald A. Jakob, Michael T. Murphy and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Kathy R. Moreno
Attorney at Law
P.O. Box 9006
Berkeley, CA 94709
(510) 717-2097

Michael T. Murphy
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9211